[No. D032752. Fourth Dist., Div. One. Mar. 14, 2001.]

MICHAEL PISCITELLI, Plaintiff and Appellant, v.
ROBERT FRIEDENBERG, Defendant and Appellant.

954

COUNSEL

Higgs, Fletcher & Mack, John Morris; Ross, Dixon & Bell, Jon R. Williams; Frantz & Geraci, James P. Frantz and Alan L. Geraci for Plaintiff and Appellant.

Horvitz & Levy, Peter Abrahams, Julie L. Woods, L. Rachel Lerman Helyar; Lewis, D'Amato, Brisbois & Bisgaard, Alan E. Greenberg, Jeffrey A. Miller and Douglas R. Reynolds for Defendant and Appellant.

OPINION

**O'ROURKE, J.**—Robert Friedenberg appeals a judgment and orders denying his motion for judgment notwithstanding the verdict (JNOV) and partially granting a new trial following a jury verdict finding Friedenberg committed negligence in connection with his legal representation of Michael Piscitelli. Piscitelli retained Friedenberg's law firm to pursue claims against his employer, Prudential Securities, Inc. (Prudential), based in part on allegations that Prudential misrepresented to its brokers the safety, operation and yields of certain limited partnership investments, causing the brokers to sell the investments to customers unsuited for their actual risk. Piscitelli sued Friedenberg for malpractice after Friedenberg failed to opt Piscitelli out of a separate class action lawsuit against Prudential brought by limited partnership investors, which resulted in the release of Piscitelli's claims that would have been presented to a panel of New York Stock Exchange (NYSE) arbitrators. The jury awarded Piscitelli $223,824,560 in damages, including $221,389,400 representing the punitive damages the arbitrators in the underlying proceeding would have awarded based on the jury's finding that Prudential acted with oppression, malice or fraud. The court denied Friedenberg's motion for JNOV, but granted a new trial on damages if Piscitelli did not consent to a remittitur of $221,389,400.

Friedenberg contends the court erred in denying his motion for JNOV because he had no legal duty to opt Piscitelli out of the Prudential class

action, and Piscitelli failed to present substantial evidence he would have prevailed in his underlying case against Prudential. Alternatively, Friedenberg contends he is entitled to a new trial on both liability and damages because the court erred in conducting the "trial-within-a-trial" format of his action by (1) allowing a jury to decide whether a securities arbitration panel would have ruled in Piscitelli's favor; (2) allowing experts to testify about the ultimate result of the underlying arbitration; (3) admitting into evidence settlement agreements between Prudential and the SEC (Securities and Exchange Commission) and other government entities; (4) refusing to admit evidence of client complaints filed against Piscitelli; and (5) refusing to give jury instructions setting forth certain securities arbitration rules. Finally, Friedenberg asserts that if he is entitled to a new trial on damages, Piscitelli may not seek damages for lost commissions on managed accounts and lost punitive damages because lost commissions are speculative as a matter of law and encompassed within the exclusive remedy of workers' compensation, and lost punitive damages are not recoverable as a matter of law and public policy.

Piscitelli appeals the court's order granting a partial new trial, contending the court abused its discretion by ordering a new trial on both compensatory and lost punitive damages when it determined only that the punitive damages component was unsupported by the evidence and the result of passion and prejudice. Piscitelli asserts the court's order should be modified to reinstate the compensatory damage award and grant a new trial on the punitive damages component alone.

We conclude the court misperceived the jury's role in this "arbitration within a trial" and that its error in permitting Piscitelli's expert to testify about the ultimate result of the arbitration, combined with inadequate and incomplete jury instructions, prejudicially affected the outcome of the trial. We further conclude that, in legal malpractice actions, permitting a jury to impose punitive damages on a negligent defendant by restyling them as compensatory "lost punitive damages" is unjust and contrary to public policy. Accordingly, we reverse.

FACTUAL AND PROCEDURAL HISTORY

We recite the facts most favorable to the judgment. (*GHK Associates v. Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 872 [274 Cal.Rptr. 168].) In October 1986, Prudential successfully recruited Piscitelli as a broker by promoting attractive incentives for selling limited partnership investments Prudential offered to investors. Prudential offered its brokers an opportunity to obtain a generous commission when the partnerships were eventually

sold. Piscitelli was motivated by the possibility of making approximately $1.5 million in profits from his sales after 12 years.

Piscitelli eventually made selling the limited partnerships a large part of his business. He relied on Prudential's marketing materials to familiarize himself with the limited partnership investments as he was told to do, believing that Prudential had conducted its own due diligence before putting its name on the investment products. He also read the accompanying prospectuses to the best of his ability. Piscitelli's practice was to provide all of his clients with any investment's prospectus, advise them that it included a "risk factors" section, suggest they might have a lawyer or accountant review it and tell them to call him back if they had any questions. Yet Piscitelli himself was discouraged from reading the prospectuses. Piscitelli was also told, and information provided to brokers from Prudential's co-general partner represented, that Prudential could not borrow money for the partnerships and they purchased all investment properties for cash. Nevertheless, Piscitelli conducted his own due diligence into the investments by attending meetings where wholesalers discussed the programs, touring properties purchased by some of the partnerships, and meeting with persons in the particular group at Prudential that handled the limited partnerships.

From late 1986 to about early to mid-1989, Piscitelli sold $6.8 million in the limited partnerships to his friends and clients who had previously held conservative investments in triple-A bonds, certificates of deposits (CD's), tax exempt securities and mutual funds. Piscitelli himself invested in some of the partnerships.

Prudential had misrepresented many aspects, including safety and potential yields, of the limited partnership investments. Prudential represented to brokers in promotional materials that the limited partnerships were comparable to long-term CD's, safe investments suitable for conservative investors; that they were income-producing and backed by a "letter of credit"; and that investors could expect anticipated returns or yields in the range of 15 to 20 percent annually. In fact, the limited partnerships were high-risk investments without a reliable secondary market, and they were losing money. Contrary to Prudential's representations, the limited partnerships did not have proven "track records" of regular profit distributions. Prudential did not disclose that past or projected distributions from the limited partnerships included return of investor capital and in some cases distribution of borrowed funds. For example, in 1985 Prudential had taken out a loan in order to make distributions to investors in oil and gas partnerships that were not from the partnership earnings. The loan was camouflaged; it was not disclosed on the prospectus and neither a client nor a broker could have seen

that distributions were handled in this manner. Piscitelli was never told that Prudential or its cogeneral partner were borrowing money from the partnerships to pay returns to investors, and he could not have learned such information from the prospectuses even had he reviewed them. Prudential gave its brokers information representing that its limited partnerships were making money and the brokers relied upon that information to continue to sell customers interests in additional limited partnerships formed by Prudential and its cogeneral partner.

In mid-1989, Piscitelli started to suspect there were problems with the limited partnership investments, and distributions "just went away." He began getting telephone calls from concerned clients. After unsuccessfully attempting to obtain information from Prudential's cogeneral partner and Prudential personnel at a due diligence meeting, Piscitelli stopped selling the partnerships and began to focus on a new Prudential program (known as "money under management") in which he arranged for a professional money manager to manage the stocks, bonds and other investments of his clients.

Between 1992 and 1996, numerous complaints were made against Piscitelli by his clients in connection with their limited partnership investments. Prudential paid for Piscitelli's defense and settled the lawsuits, but as it was required to do it listed the client complaints on Piscitelli's permanent broker record, a publicly available listing of information concerning the background and complaints made against brokers.[1] In 1993, Piscitelli took disability leave from Prudential due to severe depression. Another broker handled Piscitelli's largest money management account until the client representative, dissatisfied with its handling and aware of Prudential's bad publicity, moved the account to another firm. At the time of trial, that account was being managed by an independent broker who earned approximately $280,000 in handling fees from the account. Piscitelli unsuccessfully sought positions with other major brokerage firms and with Bank of America Investment Services, which declined his application due to the complaints on his CRD.

Prudential was investigated by and ultimately entered into a settlement agreement with the SEC, the National Association of Securities Dealers (NASD) and the California Securities Regulation Division to pay money into

---

[1]The record is referred to as a broker's CRD, or central registration depository. It lists a broker's individual information (name, Social Security number, date of birth and schooling) as well as licensing exams taken and employment history. The CRD also lists complaints or lawsuits against the broker, as well as their favorable or unfavorable outcomes. According to Piscitelli's expert, unfavorable items could be expunged from the CRD by bringing a lawsuit against the brokerage house and convincing an arbitration panel that the complaints are wrongfully listed.

a fund for claims relating to certain limited partnership matters. It entered into an agreement with the United States Attorney's Office to comply with certain conditions and paid an additional $330 million into the settlement funds.

*The Underlying Lawsuit*

In 1995, Piscitelli retained an attorney, Robert Scott Dreher, who filed a complaint against Prudential containing causes of action for fraud, breach of fiduciary duty, negligent misrepresentation, breach of contract, intentional interference with prospective economic advantage, and unfair business practices. Piscitelli alleged, inter alia, that but for Prudential's fraud and his reliance on its representations, he would not have accepted employment with Prudential; he would not have sold the limited partnership investments to his clients or purchased them for his own account; and that Prudential's actions caused him emotional distress and the loss of employability. He sought compensatory damages for lost salary, lost economic opportunity, repayment of his investments, lost income and punitive damages.

Shortly after he filed Piscitelli's complaint, Dreher received a copy of a consolidated class action complaint filed against Prudential in the United States District Court for the Southern District of New York (*In re Prudential Securities Inc.*, MDL (Multi-district Litigation) No. 1005) (the class action). After Dreher transferred to a law firm that could not accept the case, Piscitelli retained the Grady Law Firm to handle his lawsuit. Piscitelli's retainer agreement provided he retained the Grady Law Firm for the "prosecution of all claims that I may have against [Prudential], and/or whomever may be responsible for injuries and damages sustained by me." Piscitelli understood that his agreement with the Grady Law Firm contemplated its prosecution of claims not only for damages stemming from his loss of clients, but also to clear the complaints on his CRD. Piscitelli's entire file, including a copy of the class action complaint and Piscitelli's CRD, was transferred from Dreher's firm to the Grady firm.

At some point after Piscitelli's case was transferred to federal court and ordered to arbitration, it was assigned within the Grady firm to Friedenberg. Friedenberg met with Grady and the Grady associate who initially handled Piscitelli's case, and reviewed Piscitelli's file. About that time, Friedenberg learned that Piscitelli himself had invested in some of Prudential's limited partnerships. Friedenberg also spoke with Dreher. Dreher suggested Friedenberg attend an educational seminar on securities arbitrations, and referred him to other San Diego attorneys who were willing to share information about cases they were handling against Prudential. Friedenberg obtained and reviewed a copy of the NYSE Arbitration Rules. Throughout his handling of

the case, Piscitelli provided assistance and information to Friedenberg, including copies of newspaper articles mentioning the class action lawsuit and its tentative settlement. An August 31, 1995 article reported the court's preliminary approval of the class action settlement, stating the settlement "would bring to an end nearly all remaining court claims from investors against Prudential from soured partnerships. . . ." Friedenberg's billing records indicate he reviewed the article.

In early October 1995, while in New Mexico, Piscitelli met with another Prudential broker who was also an investor in the limited partnerships. At that time, that broker received a notice advising her of the pendency of the class action lawsuit against Prudential, and the proposed settlement of that lawsuit. The notice expressly advised class members, defined as "persons . . . who . . . purchased from or through [Prudential] . . . units in any of the [limited partnerships]" that if they wanted to be excluded from the class, a written request for exclusion had to be received no later than October 30, 1995. The notice explained that the "Settled Claims" included "all claims, rights or causes of action or liabilities whatsoever . . . that have been, . . . or in the future might be asserted in any forum by the Class member . . . against any of the Released Parties . . . which relate in any way to the marketing, purchase, sale or holding of [limited partnership units] . . . ." In capital print, it further stated: "THE RELEASE TO BE GIVEN TO THE [PRUDENTIAL] SETTLING DEFENDANTS AND THE RELEASED PARTIES IS VERY BROAD AND MAY IMPACT UPON OTHER RIGHTS OR CAUSES OF ACTION YOU HAVE . . . . READ THIS NOTICE IN ITS ENTIRETY." In mid-October, Piscitelli told Friedenberg that the broker had received some legal document about the class action, and Friedenberg in response advised Piscitelli to check his mail for it and give him a call. When Piscitelli advised Friedenberg he did not receive any notice, Friedenberg told him not to worry about it.

Later that month, Piscitelli had another conversation with the broker in New Mexico about the October 30, 1995 "opt out" date. Piscitelli called Friedenberg and told him there was an October 30, 1995 deadline that might or might not pertain to him. Friedenberg responded he would "take care of it." Friedenberg did not obtain a copy of either the notice of the class action settlement or the settlement agreement, nor did he opt Piscitelli out of the class. On October 30, 1995, Friedenberg sent Prudential's attorneys Piscitelli's agreement to submit his case to arbitration and Piscitelli's statement of claim.

Ultimately, Prudential asserted that Piscitelli's claims had been settled in the class action and advised Friedenberg to dismiss them. Friedenberg unsuccessfully petitioned the court to permit Piscitelli to opt out after the

deadline. The court found the class notice gave inquiry notice to Prudential employee/investors seeking to bring claims against Prudential for harm to their business reputation and injuries arising from their sale of the investments, and having failed to make such inquiry and object to the scope of the release at a fairness hearing, their request for relief was untimely, thus barring those claims.[2]

*The Malpractice Lawsuit*

Piscitelli sued Friedenberg, the Grady Law Firm, the Frederickson firm and Grady and Frederickson individually, alleging causes of action for professional negligence, breach of fiduciary duty, constructive fraud and negligent infliction of emotional distress. Piscitelli settled with all defendants except Friedenberg, and proceeded to trial against him.[3] The jury rendered a verdict in Piscitelli's favor, finding Friedenberg negligent and that his negligence damaged Piscitelli. It found Prudential caused Piscitelli to be disabled from January 1993 to January 1998, and that he suffered $510,824 in economic loss during this period. The jury further found the NYSE arbitrators would have awarded Piscitelli a total monetary award, excluding punitive damages, of $1,905,122. It determined that Piscitelli's total damage caused by Friedenberg's negligence was $2,435,160. Finally, the jury found by clear and convincing evidence that Prudential was guilty of oppression, malice or fraud in its conduct.

---

[2]Friedenberg has filed a motion to strike from Piscitelli's brief facts regarding alleged misconduct, including the filing of false declarations, by Friedenberg after October 30, 1995, in connection with his attempts to obtain an order for a late exclusion from the class action. At trial, Piscitelli's counsel argued that such evidence was relevant to "continuing malpractice" and "breach of fiduciary duty from an ethics standpoint." The court found Friedenberg's conduct after October 30, 1995, would be relevant only to the extent an expert could testify that, absent Friedenberg's misconduct, the class action judge would have changed his ruling and granted Friedenberg's request for a late opt out. The court ulimately excluded the opinion of Piscitelli's expert that the class action judge more likely than not would have ruled differently as speculative and beyond the scope of his expert designation and deposition testimony. It further ruled, "So for those reasons, and also I don't see any connection between damages and these subsequent allegations of malpractice, I don't think anybody's going to be able to make that connection so far that's been presented to the court, that under [Evidence Code section] 352, it would seem to me that any probative value on the underlying issues is greatly outweighed by the amount of time consumed by these issues." The court's intention to prohibit evidence of post October 30, 1995 misconduct or any mention of Friedenberg suborning perjury is further suggested by its comments occurring later in the trial, in which it found certain deposition testimony would not "open the door" to circumvent its prior ruling. Piscitelli does not challenge the court's evidentiary ruling on appeal. Thus, we disregard evidence of Friedenberg's alleged misconduct occurring after October 30, 1995, as outside the record before us. (E.g., *Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184, fn. 1 [151 Cal.Rptr. 837, 588 P.2d 1261].)

[3]The court granted Friedenberg's motions in limine to bar evidence of emotional distress damages and later for nonsuit on Piscitelli's breach of fiduciary duty claim.

Following the jury's verdict, the parties presented further evidence on the issue of whether the NYSE panel would have awarded Piscitelli punitive damages against Prudential. The jury found the arbitrators would have awarded Piscitelli punitive damages against Prudential in the amount of $221,389,400. After subtracting Piscitelli's disability loss ($510,824) and settlement payments ($60,000), the court calculated Piscitelli's total award to be $223,253,736.

Friedenberg moved for JNOV and for a new trial on grounds of excessive damages, insufficient evidence, legal errors, counsel misconduct and inconsistency of the verdict. The court denied Friedenberg's motion for JNOV, but granted a new trial on damages conditioned on Piscitelli's consent to a $221,389,400 remittitur. It ruled the punitive damages component of the compensatory damage award was not supported by the evidence; that "contrary to law," the jury failed to "properly consider other costs and penalties incurred by Prudential as a result of the massive litigation and governmental investigations based on the same conduct alleged by [Piscitelli]" and that "the jury was under the misimpression that they were sending a message to Prudential." Based upon these findings and its conclusion that the "verdict could only have been the result of prejudice and passion" the court ruled the damages were excessive, the evidence insufficient to support the verdict and the verdict against the law.

After Piscitelli refused to accept the remittitur, Friedenberg appealed from the judgment, the denial of his motion for JNOV and the partial grant of his motion for new trial. Piscitelli appealed from the court's partial grant of a new trial.

DISCUSSION

I. <em>New Trial</em>

Friedenberg contends he is entitled to a new trial on liability and damages based on numerous errors by the court in conducting the trial-within-a-trial format of Piscitelli's legal malpractice action, including permitting a jury trial on the underlying arbitration, admitting expert testimony on the ultimate issue of whether Piscitelli would have succeeded before the NYSE arbitration panel, and declining to give certain jury instructions on the rules the arbitrators would have applied and under which they would have operated. While we conclude the court correctly permitted the jury to hear and decide the underlying arbitration within the trial, we agree the court misperceived the jury's role in the case-within-a-case format and erred in admitting the expert testimony. That error, combined with inadequate instructions, entitles

Friedenberg to a new trial on both liability and damages. We address the remaining new trial issues and other issues to the extent they will arise upon retrial of the case.

## A. Standard of Review

■ "[A]lthough the trial court 'is accorded a wide discretion in ruling on a motion for new trial and . . . the exercise of this discretion is given great deference on appeal . . . we are also mindful of the rule that on an appeal from the judgment it is our duty to review all rulings and proceedings involving the merits or affecting the judgment as substantially affecting the rights of a party . . . including an order denying a new trial. In our review of such order denying a new trial, as distinguished from an order granting a new trial, we must fulfill our obligation of reviewing the entire record, including the evidence, so as to make an independent determination as to whether the error was prejudicial. [Citations.]' [Citations.]" (*Enyart v. City of Los Angeles* (1999) 76 Cal.App.4th 499, 508 [90 Cal.Rptr.2d 502], quoting *City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 871-872 [135 Cal.Rptr. 647, 558 P.2d 545].)

## B. Right to Jury Trial on Underlying Arbitration

■ Before trial, Friedenberg moved in limine for a bench trial on the trial-within-a-trial aspect of the case. He argued in part that the court or an arbitration panel should hear the underlying case because it would have been before arbitrators with specialized expertise, and the issues presented to the arbitration panel would be so complex that having a lay jury decide them would render his trial unfair. The court denied the motion ruling that, while "it makes some sense to find out what would have happened at the arbitra- tion of this matter . . . [,] I think that flies in the face of the constitutional provisions allowing for trial by jury." Friedenberg contends this ruling was error. He reasons that courts are required to determine questions of law, and it therefore follows that where the underlying case would be decided by the court or a special tribunal, the trial-within-a-trial should be decided by the court and not a jury. We reject his reasoning.

Piscitelli had a constitutional right to a jury trial in his professional negligence action, including its trial-within-a-trial aspect, because it is a civil action at law. (Cal. Const., art. I, § 16; *American Motorists Ins. Co. v. Superior Court* (1998) 68 Cal.App.4th 864, 871 [80 Cal.Rptr.2d 621], citing *Abbott v. City of Los Angeles* (1958) 50 Cal.2d 438, 462 [326 P.2d 484]; *Ceriale v. Superior Court* (1996) 48 Cal.App.4th 1629, 1634-1635 [56 Cal.Rptr.2d 353] [constitutional right to a jury trial is not abrogated in a

legal malpractice action simply because the underlying action was one in equity and equitable principles would come into play in resolving liability and damages issues].) A determination of the underlying case in a legal malpractice action is part and parcel of the element of causation—that is, whether Piscitelli would have prevailed in an arbitration proceeding before the NYSE and obtained an award against Prudential absent Friedenberg's negligence. (See *Campbell v. Magana* (1960) 184 Cal.App.2d 751, 754 [8 Cal.Rptr. 32] [trial-within-a-trial method requires that plaintiff prove that careful management of his underlying lawsuit would have resulted in recovery of a favorable judgment and collection of same]; *Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 832 [60 Cal.Rptr.2d 780] [while this approach is "admittedly burdensome and complicated" it "avoids 'speculative values as a measure of recovery' "].) Our conclusion is consistent with numerous out-of-state authorities holding that in legal malpractice cases, whether a court or jury decides the underlying case-within-a-case does not turn on the identity or expertise of the trier of fact, but whether the issues are predominately questions of fact or law. (See *Charles Reinhart Co. v. Winiemko* (1994) 444 Mich. 579 [513 N.W.2d 773, 777] [whether an appeal lost because of an attorney's negligence would have succeeded if properly pursued is an issue for the court because the resolution of the underlying appeal originally would have rested on a decision of law]; *Brust v. Newton* (1993) 70 Wash.App. 286 [852 P.2d 1092, 1094-1096] [lawsuit alleging negligence by attorney in drafting a prenuptial agreement is an action in tort and the question whether the attorney's negligence was a cause in fact of damage was a factual matter for the jury to decide]; *Phillips v. Clancy* (1986) 152 Ariz. 415 [733 P.2d 300, 306, 307] [jury decides how a reasonable administrative law judge should have ruled on an applicant's eligibility for Social Security benefits had the applicant's attorney filed a timely appeal; "If the underlying suit would have been tried to a jury, or a judge sitting as a trier of fact, we conclude that the jury in the malpractice case should decide the disputed factual issues pertaining to the original suit"]; *Helmbrecht v. St. Paul Ins. Co.* (1985) 122 Wis.2d 94 [362 N.W.2d 118, 134] [rejecting claim that damages claim in a divorce suit should be tried to a judge and not a jury because it is normally a determination exclusively for the court; court held that focus in attorney malpractice action is not on whether the original action is tried before a jury but whether the issue is one of law or one of fact; causation and damages are generally questions of fact for a jury to decide]; *Chocktoot v. Smith* (1977) 280 Or. 567 [571 P.2d 1255, 1259] [jury decides how a reasonable probate judge should have ruled on whether a claimant was a decedent's heir had the claimant's attorney properly discovered and presented evidence and filed a timely appeal of the original adverse decision].)

Given the highly contested evidentiary issues relating to Piscitelli's knowledge, the issue of causation—whether his claims in arbitration would

have been successful had they been brought—was one of fact for the jury to decide. (*Kurinij v. Hanna & Morton* (1997) 55 Cal.App.4th 853, 864 [64 Cal.Rptr.2d 324] [in a legal malpractice action, causation, i.e., " 'the question about what would have happened had [the lawyer] acted otherwise,' " is a question of fact unless reasonable minds could not differ as to the legal effect of the evidence presented].) Piscitelli's claims in the underlying arbitration required numerous factual determinations as to the existence and scope of Prudential's fraud in connection with its limited partnership investments, Piscitelli's knowledge of the risks presented by the partnership investments, and representations Piscitelli made to his clients and whether those representations were consistent with his knowledge or lack thereof.

Friedenberg essentially argues the jury was not qualified or sufficiently experienced to determine the issues put before a specialized arbitration panel and therefore as a fairness matter those issues should have been determined by the court. The typical three-member NYSE arbitration panel, however, is not solely comprised of industry experts and lawyers; it also includes a member of the public. We do not agree that in this particular case, the issues to be arbitrated were so complex and numerous that a lay jury, properly instructed, could not comprehend them. The case primarily involved one broker's knowledge and conduct in selling limited partnership investments to his clients; it was not a complex securities matter involving thousands of investor claims and numerous or complicated violations of securities laws. The fact that Piscitelli waived his right to a jury trial when he agreed to arbitrate his claims against Prudential does not, in his legal malpractice action, transmute factual issues into questions of law, or remove them from determination by a jury. Friedenberg fails to cite a single legal question that he claims was left to be decided by the jury. The court did not abuse its discretion in denying Friedenberg's motion for new trial on this ground.

## C. *The Court Erred in Admitting Expert Testimony on an Ultimate Issue*

Before trial, Friedenberg moved in limine to exclude expert testimony on the ultimate result of the underlying arbitration, arguing such testimony would improperly focus on what the NYSE arbitration panel would have done (as opposed to what it should have done) and also usurp the jury's function to decide what should have been the result of the arbitration. The court denied the motion, reasoning: "The issue in this case, as I understand the law, is whether or not the plaintiff would have prevailed in the securities arbitration process. And whether or not he would have [] prevailed is an issue that requires expert testimony. [¶] The jury is not going to sit as a surrogate arbitrator and decide the arbitration as the jury. What

they're going to decide is, based upon what's been presented, would he have prevailed at that arbitration. In order to know that, they need the help of an expert since none of us [are] probably qualified to make that determination; clearly not the jurors. So it's no different than, I think, medical malpractice case where the issue is, had the doctor treated the matter differently, would have patient be walking today instead of in a wheelchair? Well, the jury doesn't have to decide—they're not doctors, they can't go in and do it or make those calls but they can hear experts who say, yes, if they had done 'x,' this is what would probably happen, if they'd done 'y,' this is what would probably happen . . . . Unless I see something contrary, the issue is going to be one that would require expert testimony."

In keeping with the court's ruling, Piscitelli's expert, Blake Weston, was asked to give an opinion on the "relative probability Mr. Piscitelli might have prevailed had the arbitration . . . before the [NYSE] been permitted to go forward." He testified that "Piscitelli would very likely have prevailed in getting both monetary relief as well as having his CRD improved had the [NYSE] arbitration gone to completion."

■ We review the court's admission of expert testimony for clear abuse of discretion, looking to whether the court's ruling "exceeded the bounds of reason." (*Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1431 [77 Cal.Rptr.2d 574]; *Korsak v. Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1522-1523 [3 Cal.Rptr.2d 833].) "As a general rule, the opinion of an expert is admissible when it is '[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . .' (Evid. Code, § 801, subd. (a).) Additionally, in California, '[t]estimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact.' (Evid. Code, § 805.) However, the admissibility of opinion evidence that embraces an ultimate issue in a case does not bestow upon an expert carte blanche to express any opinion he or she wishes. [Citation.]" (*Summers v. A.L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1178 [82 Cal.Rptr.2d 162] (*Summers*).) In *Summers*, the court held that even if an expert opinion does not embrace an issue of law, it is not admissible if it invades the province of the jury to decide a case. " 'Undoubtedly there is a kind of statement by the witness which amounts to no more than an expression of his general belief as to how the case should be decided . . . . There is no necessity for this kind of evidence; to receive it would tend to suggest that the judge and jury may shift responsibility for decision to the witnesses; and in any event it is wholly without value to the trier of fact in reaching a decision.' " (*Summers, supra,* 69 Cal.App.4th at pp. 1182-1183, citing 1 McCormick on Evidence (4th ed. 1992) § 12, p. 47, fn. omitted.)

■ Although the court here obviously believed expert opinion on the ultimate result of the arbitration would assist the jury in rendering its decision, we conclude its admission in this case was a clear abuse of discretion. In ruling as it did, the court misconceived the jury's function in the legal malpractice case-within-a-case format. This format is properly employed as the method of proving the elements of causation and damages when the malpractice involves negligence in the prosecution or defense of a legal claim. (*California State Auto. Assn. Inter-Ins. Bureau v. Parichan, Renberg, Crossman & Harvey* (2000) 84 Cal.App.4th 702, 709 [101 Cal.Rptr.2d 72]; *Mattco Forge, Inc. v. Arthur Young & Co., supra*, 52 Cal.App.4th 820, 832-834.) When a client seeks to recover damages for his attorney's negligence in the prosecution or defense of the client's claim, the client must prove causation—that "but for that negligence a better result could have been obtained in the underlying action." (*Travelers Ins. Co. v. Lesher* (1986) 187 Cal.App.3d 169, 197 [231 Cal.Rptr. 791], disapproved on other grounds in *Buss v. Superior Court* (1997) 16 Cal.4th 35, 65 [65 Cal.Rptr.2d 366, 939 P.2d 766].) Proof that Piscitelli would have prevailed in the underlying arbitration required a determination of the merits of that underlying proceeding in the malpractice trial. (*Galanek v. Wismar* (1999) 68 Cal.App.4th 1417, 1425 [81 Cal.Rptr.2d 236].)

In permitting expert testimony on this issue, the court was perhaps mislead by the statement in *Mattco Forge* that the "trial-within-a-trial method does not 'recreate what a particular judge or fact finder would have done. Rather, the jury's task is to determine what a reasonable judge or fact finder would have done . . . .'" (*Mattco Forge, Inc. v. Arthur Young & Co., supra*, 52 Cal.App.4th at p. 840, citing *Brust v. Newton, supra,* 852 P.2d at p. 1094.) *Mattco* should not be read to permit experts to tell the jury what a reasonable trier of fact would have done. Rather, *Mattco* simply sets out the objective standard the jury uses when deciding the underlying case—the jury must attempt to decide the case not as a particular judge or jury, but independently as the fact finder. The Oregon Supreme Court in *Chocktoot v. Smith, supra,* 571 P.2d 1255 aptly explained the jury's role while pointing out that in a legal malpractice action the jury decides fact issues, but not legal issues: "[E]ven when the alleged negligence concerns the conduct of a jury trial, the 'causation' issue [i.e. the-case-within-the-case] does not call for reconstructing of the probable behavior of the actual jury in that trial. It does not call for bringing the jurors into court and subjecting them to examination and cross-examination to determine what they would have done if the case had been tried differently, nor does it call for expert testimony about the characteristics or the apparent attitudes of those jurors. Although the issue is stated to be the probable outcome of the first case, the second jury is permitted to decide this by substituting its own judgment for that of

the factfinder in the earlier case. Once it is accepted that this is what the malpractice jury does, there is no reason why the jury (or a court when sitting without a jury) should not do the same even when the earlier factfinder was a judge, an administrative hearing officer, an arbitrator, a court-martial, or any tribunal deciding on factual grounds. However, no jury can reach its own judgment on the proper outcome of an earlier case that hinged on an issue of law. Unlike its decision of a disputed issue of the professional standard of care, the jury cannot decide a disputed issue of law on the testimony of lawyers." (*Id.* at p. 1258.)

Under this format, it was precisely the jury's role to step into the shoes of the arbitrators, consider the facts of Piscitelli's underlying claims and ultimately determine their merits. Here, however, the court improperly shifted the jury's responsibility to decide the issue by permitting Piscitelli's expert to, in essence, testify that arbitrators would have granted Piscitelli monetary relief and cleared his CRD had the matter been presented to them. To entrust that ultimate determination to an expert, i.e., to allow the expert to reach the ultimate question of whether Piscitelli's underlying arbitration would have been successful, invades the jury's function. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1099 [56 Cal.Rptr.2d 142, 921 P.2d 1] [an expert must not usurp the function of the jury]; see also *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 567 [34 Cal.Rptr.2d 607, 882 P.2d 298] (*Soule*); *Summers, supra,* 69 Cal.App.4th at p. 1178.)

D. *Instructional Error*

We conclude the court's error in admitting the expert's testimony was prejudicial in view of the court's refusal to give instructions that would have permitted the jury to properly perform its function as the trier of the underlying arbitration. The jury was instructed as follows: "In the 'case within the case,' [Piscitelli] was to have his claim against [Prudential] heard before the New York Stock Exchange panel. In this lawsuit, you, the jury, must determine what the arbitration panel would have decided and the amount, if any, the arbitration panel would have awarded. [¶] Evidence has been presented about the process and scope of a New York Stock Exchange arbitration. The arbitration panel had the power to find for . . . Piscitelli and award monetary damages to [Piscitelli] and/or strike negative remarks from [Piscitelli's] broker record. Or the arbitration panel had the power to find for Prudential, despite any misconduct by Prudential, if the arbitration panel were to find that [Piscitelli] materially violated the rules of the [NASD] governing securities brokers, and his fiduciary duties to his customers. These are matters for your consideration in the 'case within the case.' "

During deliberations, the jury posed the following question: "We would like to see a copy of the written rules and regulations, industry standards, and the code of ethics pertaining to a licensed stock broker." In response to the jury's question, Friedenberg submitted jury instructions setting forth various NASD general rules, rules of conduct and fair practice rules dealing with broker obligations, rules about a broker's fiduciary duties to clients and rules relating to injuries exclusively recoverable under the Workers' Compensation Act.[4] The court refused the instructions in part because an expert told the jury how the arbitration was to proceed and what would have happened. It reasoned: "What concerns me here is that we're dealing with a case inside a case and the case we're dealing with is one of what the arbitrators would do with this information, and the jury's obligation here is to figure out what would have happened in the arbitration and I think that really is—at least the way we tried the case, rightly or wrongly—has been styled as one that has required some expert testimony to tell them, this is the way an arbitration proceeds. This is what would have happened if the following items would have been found, and had experts testify about that. [¶] To give them instructions now as to the stockbroker's obligation I don't think tells them or helps them decide what an arbitrator or arbitration panel would have done with this information, how they would have weighed it."

Had the arbitration within a case been correctly tried, i.e., had the jury been permitted to step into the shoes of a reasonable NYSE arbitration panel, instructions on the rules and regulations governing and applied by the arbitrators would have been proper and would have assisted the jury in its role. The court's failure to give these instructions was clearly premised on its erroneous admission of expert testimony on the ultimate question for the jury's resolution. Although we do not reach the propriety of each instruction proposed by Friedenberg, we hold the court should have permitted correct, nonargumentative instructions on the rules and regulations governing

---

[4]Specifically, the proffered instructions set forth a profile of the NASD and application of its rules from the NASD Manual (administrative section and rule 0115(a)); rules relating to a broker's fiduciary duties to act in good faith, determine the customer's actual financial situation and needs, and to make risks known to the customer despite the customer's stated objectives (*Duffy v. Cavalier* (1989) 215 Cal.App.3d 1517, 1534 [264 Cal.Rptr. 740]; *Twomey v. Mithcum, Jones & Templeton, Inc.* (1968) 262 Cal.App.2d 690, 709 [69 Cal.Rptr. 222]); NASD proscriptions against engaging in outside business activities and private or unauthorized securities transactions (NASD Manual, rules 2310, 3030, 3040); and NASD member rules of conduct relating to a broker's fair dealing with customers and obligation to learn essential facts relating to every customer and order (NASD Manual, rules 2310.2, 2810). Friedenberg's instructions relating to the remedy of workers' compensation stated that the court could not award damages for injuries occurring while Piscitelli was acting within the scope of his employment, advised the jury about employees and the scope of employment and defined specific and cumulative injuries arising out of employment (BAJI No. 15.12 (modified); Lab. Code, §§ 3208, 3208.1).

NYSE arbitrations, as well as rules, regulations and law applicable to the conduct of brokers that the arbitration panel would have had before it in reaching a decision on Piscitelli's claims against Prudential. In order to put Piscitelli to "trying" his arbitration against Prudential to the jury, the jury should consider all rules that would be before the panel. We recognize that this requirement may be "burdensome and complicated" (*Mattco Forge, Inc. v. Arthur Young & Co., supra*, 52 Cal.App.4th at p. 832), but that is the nature of the case-within-a-case format of legal malpractice actions. Indeed despite any perceived difficulty in performing the task of a NYSE arbitration panel, the jury attempted to undertake that task and asked to consider the applicable rules and regulations. Absent those tools, it was left with a conclusory and inadequate instruction and improper expert testimony on which to base its decision.

Based on the totality of the circumstances, we cannot conclude the cumulative errors identified above were harmless. The jury should have been permitted to decide the underlying arbitration without influence from Weston's testimony as to its probable outcome. Although the jury attempted nevertheless to conduct itself as an arbitration panel would, due to the incomplete jury instructions, the jury was without pertinent rules and/or law that would have permitted them to assess whether Piscitelli made misrepresentations or violated his fiduciary duties as a broker independent of Prudential's fraud. We believe it probable that the incomplete instructions caused the jury to rely heavily on the expert's conclusions as to how the arbitrators would rule, thus prejudicially affecting its verdict. (*Soule, supra*, 8 Cal.4th at p. 580; *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 983 [67 Cal.Rptr.2d 16, 941 P.2d 1203] (*Rutherford*) [instructional error in civil cases requires reversal only where it seems probable that the error prejudicially affected the verdict].)

■ Under the *Rutherford* prejudice standard, we take into account " '(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled.' [Citation.]" (*Rutherford, supra*, 16 Cal.4th at p. 983; *Soule, supra*, 8 Cal.4th at pp. 580-581.) The determination of whether prejudice occurred due to instructional error depends heavily on the nature of the error, assessed in the context of the trial record, and it must be probable rather than merely possible that the jury's verdict was based on the incorrect instruction. (*Soule, supra*, at pp. 580-581 & fn. 11.) ■ *Rutherford* compels the result we reach. The record contains evidence from which a jury could find Piscitelli failed to conduct himself under the requisite standard of care entirely apart from Prudential's fraud. Although Piscitelli claimed he could not have known of Prudential's misrepresentations or the risks presented by the

limited partnership investments, other witnesses indicated certain risks of the investments in fact were known. The manager of the Carlsbad office where Piscitelli worked testified that "everyone knew" the investments were illiquid and that he had instructed Piscitelli and others that no more than one-third of his clients' portfolio should have been in illiquid investments. Piscitelli himself acknowledged in both his testimony and his claims before the arbitrators that substantial risks were disclosed in Prudential's prospectuses. Although Piscitelli's claim was that he was not aware of risks because he was instructed not to read the prospectuses, the Carlsbad office manager testified every broker was given prospectuses and instructed to read them. Piscitelli admitted telling clients needing conservative investments that the partnerships were conservative and "safe as can be," yet Prudential marketing materials listed the risk of the limited partnerships as "moderate." Friedenberg's expert testified that, in a NYSE arbitration, the arbitrators would focus upon Piscitelli's independent duty to make a judgment that the investments were suitable for his clients regardless of the content of marketing materials. While Prudential's fraud was not a highly contested matter, Piscitelli's knowledge of the risks of the limited partnership investments and whether he breached independent duties to his clients was substantially at issue.

Further, Piscitelli's counsel heavily emphasized the expert's conclusion in his closing argument to the jury.[5] This, in view of the absence of necessary and complete instructions, enhances the likelihood of prejudice. The instructions were, as indicated, woefully inadequate and, indeed, the jury expressly asked for further information in order to decide the case as arbitrators would have. The above factors support our conclusion that Friedenberg is entitled to a new trial.

E. *Admission of Consent Decrees*

■ Having concluded the jury was required in the underlying arbitration within a trial to consider the evidence that would have been before the

---

[5]Counsel told the jury: "Bottom line with this underlying claim, it's my view that without question, the underlying fraud against Prudential is clear. Without question, [Piscitelli] would have prevailed in any claim that he brought against Prudential Securities before the New York Stock Exchange. [¶] We heard from a real arbitrator . . . Blake Weston, a third of his business is being an arbitrator and he's usually the chairman. He's the chairman, he's the head arbitrator in the group, and he said he was even handling—he was arbitrating Mr. Barrett's case. If you look at that Bauder Article, talks a little bit about Barrett's case. He worked for Prudential[.] He was arbitrator for that. He said he was listening to evidence in that case and then Mr. Barrett died or something during the arbitration but he said he analyzed Michael Piscitelli's claim. He looked at some of the records, the lawsuits, and he said based upon what he observed, based upon the equities—and he said the arbitrators look at the equities. Who's the most wronged? Who's really committed the wrong here? That's called looking at the equities. Based upon that, he would have most likely have [sic] prevailed in his arbitration claim against [Prudential]."

arbitrators and determine whether Piscitelli should have prevailed, we find no abuse of discretion in the court's admitting into evidence Prudential's offer of settlement with the SEC, the SEC order instituting public proceedings, making findings and imposing sanctions, and the Department of Corporations' final consent order. The court admitted the documents acknowledging it was attempting to replicate the arbitration and reasoning, "consent decrees normally are used by arbitrators . . ." and like police reports, "[arbitrators] know how to use them so the danger is not the same as in a public tribunal where a juror might be overly influenced by some decision by a . . . governmental agency." Piscitelli's expert testified such orders would come into evidence before the arbitration panel, noting the rules of evidence do not apply in arbitration and the "evidence that comes in before an arbitration panel is very permissive . . . ." The court correctly noted that such decrees would be "foundational information that would be part of the underlying arbitration." Indeed, evidence is liberally admitted in arbitrations, including those before the NYSE. (NYSE Arbitration Rules, rule 620 ["The arbitrators shall determine the materiality and relevance of any evidence proffered and shall not be bound by the rules governing the admissibility of evidence"];[6] NYSE Arbitrator's Manual ["Arbitrators should be guided by the concepts of fairness in determining what evidence or testimony should be admitted. When in doubt, rulings are more appropriately made on the side of allowing rather than restricting evidence"].[7]) Admission of these documents was consistent with the liberal rules governing the arbitration.

Our holding that the consent orders are properly admissible in the arbitration portion of the trial does not, however, give the jury the right to rely on them for any purpose, such as conclusive evidence of liability or other facts. The jury should have been instructed on the legal significance and effect of the consent orders; for example, that Prudential did not admit or deny any of the findings or conclusions of law in the Department of Corporations final consent order.

---

[6]The record contains incomplete 1995 versions of appendices to the NYSE Arbitration Rules, specifically the Securities Arbitration Procedure Manual (appen. F) and Arbitrator's Manual (appen. H). Counsel was unable to provide this court with complete copies of these documents. Therefore, we have taken the cited excerpts from the NYSE Web site at <http://www.nasdr.com/publication.asp> [as of Mar. 14, 2001].

[7]On admissibility of evidence, the NYSE Arbitrator's Manual states in part: "The strict rules of evidence applied in a court of law are not usually used in arbitration. This does not mean that the arbitrators should accept everything presented to them. The evidence should relate to the case. The parties should be given an opportunity to object or comment on anything that is presented to the panel. The key consideration is fairness. [¶] While the Federal Rules of Evidence do not as a general matter govern the conduct of arbitration proceedings, the rules of evidence do, however, often provide good, practical guidance on what evidence is probative. The collective experience and judgment of the bar drawn upon in the formulation of these rules is useful in making particular determinations, but generally arbitration proceedings should be more informal and should permit more liberal introduction of evidence than would be permitted in court."

## F. *Admission of Investor Statements of Claims*

■ We conclude the court erred in excluding the written statements of claims made against Piscitelli and Prudential by Melvin Green, Otto and Kathleen Corsini, and Margaret Blair, investors who purchased their limited partnership interests on Piscitelli's recommendation. The court ruled their written claims irrelevant to the underlying arbitration proceeding, cumulative to their trial testimony, and inadmissible because they were not sworn and did not impeach any witness. The court reasoned in part that while the arbitrators would have been faced with a decision whether or not to clear Piscitelli's license, the jury did not have the same ability to afford such relief; it only had the ability to award Friedenberg damages.

The written statements were relevant to the question in the underlying arbitration of Piscitelli's knowledge of investment risks, and whether his representations to his clients were consistent with his knowledge or lack of knowledge. While the jury could not clear Piscitelli's actual CRD as could the arbitrators, it in any event could consider whether, by virtue of independent misrepresentations, Piscitelli was himself responsible for some of the damages he claimed to have suffered. Moreover, the statements were not merely cumulative to the testimony of the actual investors, they contained detailed enumeration of representations allegedly made by Prudential and Piscitelli, and the evidence supplemented the investors' much more general trial testimony. In view of the liberal admissibility of evidence in arbitrations, these statements should have been admitted for the jury's consideration.

## II. *Punitive Damages*

■ We further hold that in malpractice cases in which a jury finds the attorney defendant solely negligent, public policy prohibits awarding "lost punitive damages" as compensatory damages.

■ The measure of damages in a legal malpractice action involving an attorney's failure to bring a claim is "the value of the claim lost." (*Smith v. Lewis* (1975) 13 Cal.3d. 349, 361 [118 Cal.Rptr. 621, 530 P.2d 589, 78 A.L.R.3d 231] (*Smith*), disapproved on other grounds in *In re Marriage of Brown* (1976) 15 Cal.3d 838, 851, fn. 14 [126 Cal.Rptr. 633, 544 P.2d 561, 94 A.L.R.3d 164].) This rule is simply in keeping with the general rule of tort damages: an injured party may recover for all detriment proximately caused whether it could have been anticipated or not. (Civ. Code, § 3333.) In *Smith*, the court explained: "The general rule is that a plaintiff is entitled

only to be made whole: i.e., when the attorney's negligence lies in his failure to press a meritorious claim, the measure of damages is the value of the claim lost. [Citation.] Or, as stated by Justice Peters in *Pete* v. *Henderson* (1954) 124 Cal.App.2d 487, 489 [269 P.2d 78, 45 A.L.R.2d 58], an attorney's 'liability, as in other negligence cases, is for all damages directly and proximately caused by his negligence.' " (*Smith, supra,* 13 Cal.3d at pp. 361-362.)

Punitive damages, historically and by definition, are not compensation for loss. Their sole purpose is to punish and deter the wrongful actor. (*Newport v. Fact Concerts, Inc.* (1981) 453 U.S. 247, 266-267 [101 S.Ct. 2748, 2759, 69 L.Ed.2d 616] ["Punitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor whose wrongful action was intentional or malicious, and to deter him and others from similar extreme conduct"]; *PPG Industries, Inc. v. Transamerica Ins. Co.* (1999) 20 Cal.4th 310, 317 [84 Cal.Rptr.2d 455, 975 P.2d 652]; *Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1106 [23 Cal.Rptr.2d 101, 858 P.2d 568] ["Punitive damages can be justified only as a deterrent measure or as retribution"]; *Nakamura v. Superior Court* (2000) 83 Cal.App.4th 825, 833 [100 Cal.Rptr.2d 97], citing *Devlin v. Kearny Mesa AMC/Jeep/Renault, Inc.* (1984) 155 Cal.App.3d 381, 387 [202 Cal.Rptr. 204]; and *Newport v. Fact Concerts, Inc., supra,* at pp. 266-267 [101 S.Ct. at p. 2759].) "Imposition of punitive damages is triggered by the conduct and state of mind of the wrongdoer, not by the nature of the loss suffered by the plaintiff." (*Nakamura v. Superior Court, supra,* at p. 835.) This court has recognized the disfavored nature of punitive damage awards; they create the "anomaly of excessive compensation and are therefore not favored in the law." (*Dumas v. Stocker* (1989) 213 Cal.App.3d 1262, 1266 [262 Cal.Rptr. 311].)

In support of his contention that the award of compensatory damages was appropriate in this case, Piscitelli relies on *Merenda v. Superior Court* (1992) 3 Cal.App.4th 1 [4 Cal.Rptr.2d 87] (*Merenda*), the sole California authority addressing this issue, as well as several out-of-state decisions. In *Merenda,* the Third District Court of Appeal addressed whether a legal malpractice plaintiff should be entitled to recover "compensatory damages" in the form of the amount of punitive damages he or she would have obtained in the underlying action. The court reasoned that recovery of "unrecovered punitive damages" as compensatory damages was consistent with the general damages provisions of Civil Code sections 3281 ("[e]very person who suffers detriment from the unlawful act or omission of another, may recover from the person in fault a compensation therefor in money, which is called damages") and 3282 ("[d]etriment is a loss or harm suffered

in person or property"), and found recovery of such damages "no more speculative than would be the direct recovery of punitive damages in the underlying action . . . ." (*Merenda, supra,* 3 Cal.App.4th at p. 12.) The *Merenda* court further rejected the argument that the purpose of punitive damages is defeated by making negligent attorneys liable for the oppressive, fraudulent or malicious conduct of others: "Plaintiff does not seek punitive damages against defendants. Rather, she seeks the value of the recovery she lost through defendants' negligence. That value includes punitive damages she would have recovered against Brown. In the malpractice action, such damages are compensatory, not punitive." (*Id.* at p. 14.)

We find *Merenda*'s reasoning flawed in several respects. It is incorrect to characterize a punitive damage claim as a "loss" for which a legal malpractice plaintiff may be compensated in order to make him or her "whole." Civil Code section 3294 allows recovery of punitive damages "in addition to the actual damages." (*Id.,* subd. (a).) In the underlying action, an award of punitive damages has nothing to with the detriment, as that word is defined in Civil Code section 3282, suffered by a legal malpractice plaintiff. That is because, as indicated, punitive damages are not compensation for injury. They are "private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence." (*Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 350 [94 S.Ct. 2997, 3012, 41 L.Ed.2d 789].) "Whatever his or her injury, a plaintiff will be made whole by the award of compensatory damages. An award of punitive damages, though perhaps justified for societal reasons of deterrence, is a boon for the plaintiff. 'Such damages constitute a windfall . . . .' [Citations.]" (*Adams v. Murakami* (1991) 54 Cal.3d 105, 120 [284 Cal.Rptr. 318, 813 P.2d 1348]; see also *In re Related Asbestos Cases* (N.D.Cal. 1983) 566 F.Supp. 818, 822 ["Punitive damages are not a part of a plaintiff's remedies for harm suffered. . . . Unlike compensatory damages, punitive damages provide a windfall to a plaintiff. If a plaintiff is unable to recover punitive damages, he will not suffer unrectified injury"].) Where the stated goal is to make an injured plaintiff "whole," a windfall award should not be included in the damage equation.

We cannot, as a matter of policy, justify imposing an award intended to punish a wrongful actor—relabeled as compensatory—upon a defendant who did not act oppressively, maliciously, or fraudulently. Such a result simply punishes an innocent actor for another's oppressive, malicious, or fraudulent wrongdoing. A punitive damage award is uniquely justified by and proportioned to the actor's particular reprehensible conduct as well as that person or entity's net worth; in order to adequately make the award "sting," the jury is required to take such matters into consideration. (Civ.

Code, § 3294, subd. (a); *Adams v. Murakami, supra,* 54 Cal.3d at p. 123 [a plaintiff must prove a defendant's wealth before punitive damages can be imposed].) It is inconsistent with the goal of punishment to transfer the punishment to an actor innocent of the conduct necessary to justify an award of punitive damages. Courts have prohibited such a result in other contexts. (See *Evans v. Gibson* (1934) 220 Cal. 476, 489-490 [31 P.2d 389] [decedent tortfeasor's executrices or estate cannot be liable for punitive damages; "punitive damages by way of example to others should be imposed only on actual wrongdoers"].) Based on this rationale, California law prohibits indemnification of punitive damages by insurers. (See Ins. Code, § 533 ["An insurer is not liable for a loss caused by the willful act of the insured"]; *City Products Corp. v. Globe Indemnity Co.* (1979) 88 Cal.App.3d 31, 42 [151 Cal.Rptr. 494] ["[T]he policy of this state with respect to punitive damages would be frustrated by permitting the party against whom they are awarded to pass on the liability to an insurance carrier. The objective is to impose such damages in an amount which will appropriately punish the defendant in view of 'the actual damages sustained,' 'the magnitude and flagrancy of the offense, the importance of the policy violated, and the wealth of the defendant.' [Citation.] Consideration of the wealth of the defendant would of course be pointless if such damages could be covered by insurance. The onus of the award would depend entirely upon the amount of insurance coverage and not upon the legally relevant factors"].) Another court has recognized the illogic of such a result and declined to permit a "derivative" punitive damage award against a legal malpractice defendant. (*Cappetta v. Lippman* (S.D.N.Y. 1996) 913 F.Supp. 302, 306.)

Finally, we cannot justify recharacterizing an award intended to punish as one intended to compensate under the theory that the legal malpractice defendant "proximately caused" the loss of the plaintiff's punitive damages claim. (*Merenda, supra,* 3 Cal.App.4th at pp. 14-15 [distinguishing cases in which courts refused to impose a punitive damages award against a party not exhibiting the despicable, malicious, or fraudulent conduct on the ground that "in none of them did the defendants from whom punitive damages were sought do anything proximately to cause the plaintiff to lose a claim for punitive damages against a third party wrongdoer"].) Such an argument is based on the premise that the attorney's negligence was the legal or "proximate" cause of the jury's failure to award the plaintiff punitive damages. We disagree with this causation analysis. "[P]roximate cause 'is ordinarily concerned, not with the fact of causation, but with the various considerations of [public] policy that limit an actor's responsibility for the consequences of his conduct.' " (*PPG Industries, Inc. v. Transamerica Ins. Co., supra,* 20 Cal.4th at p. 316, quoting *Mosley v. Arden Farms Co.* (1945) 26 Cal.2d 213, 221 [157 P.2d 372, 158 A.L.R. 872] (conc. opn. of Traynor, J.).) Rules of legal

cause operate to relieve the defendant whose conduct is a cause in fact of the injury where it would be considered unjust to hold him legally responsible. (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 968, p. 359.) Such considerations are present here. While Friedenberg's negligence may be the cause in fact of Piscitelli's lost claims, we decline to extend the doctrine of legal causation to hold his negligence proximately caused the loss of punitive damages that might have been recovered from a third party.

### III. *Duty*[8]

 Acknowledging that he raises the issue for the first time on appeal, Friedenberg asks us to hold as a matter of law that he had no duty to opt Piscitelli out of the investor class action. He suggests this issue is one of law "presented by undisputed facts," and maintains a prudent attorney in his position would not have foreseen the settlement of that action would have encompassed employment claims; such an attorney would have instead assumed the class action was irrelevant to Piscitelli's case.

We decline to address Friedenberg's contention. As we explain, the issue he raises is not one of duty, but of breach, a question of fact that is not properly raised for the first time on appeal. (*Unigard Ins. Group v. O'Flaherty & Belgum* (1995) 38 Cal.App.4th 1229, 1237 [45 Cal.Rptr.2d 565] [formulation of standard of care is a question of law for the court, breach of duty is usually a fact issue for the jury; if the circumstances permit a reasonable doubt whether the defendant's conduct violates the boundaries of ordinary care the doubt must be resolved as a fact issue by the jury rather than of law by the court].) As a general rule, a new theory may not be presented for the first time on appeal unless it raises only a question of law and can be decided based on undisputed facts. (See *People v. Superior Court (Zamudio)* (2000) 23 Cal.4th 183, 195 [96 Cal.Rptr.2d 463, 999 P.2d 686]; *Sanchez v. Truck Ins. Exchange* (1994) 21 Cal.App.4th 1778, 1787 [26 Cal.Rptr.2d 812].)

An attorney's duty to his or her client depends on not only the existence of an attorney-client relationship, but also the scope of the duties assumed by the lawyer. (*Nichols v. Keller* (1993) 15 Cal.App.4th 1672, 1684 [19 Cal.Rptr.2d 601].) Here, there is no dispute that Friedenberg and Piscitelli had an attorney-client relationship and the scope of Friedenberg's representation under Piscitelli's retainer agreement was to "prosecut[e] . . . all

---

[8]We reach only the duty of care issue pertinent to Friedenberg's motion for JNOV given the likelihood it will arise upon retrial of this case. Because we reverse the matter for a new trial, we need not address Friedenberg's claims regarding the sufficiency of evidence of causation, nor do we reach Piscitelli's cross-appeal contesting the court's partial grant of new trial on damages.

claims" Piscitelli may have had against "[Prudential], and/or whomever may be responsible for injuries and damages sustained by [him]." Their attorney-client relationship gave rise to a duty by Friedenberg to exercise ordinary judgment, care, skill and diligence in the performance of those tasks he undertook, i.e., prosecuting Piscitelli's claims against Prudential. (*Nichols v. Keller, supra,* at p. 1682.) The court properly instructed the jury as to the legal duties of care owed by Friedenberg through BAJI No. 6.37.[9]

Friedenberg asks that we hold the scope of his duty to Piscitelli did not encompass investigating the pending class action involving claims for lost investments. He cites to *Nichols v. Keller* and *Davis v. Dramrell* (1981) 119 Cal.App.3d 883, 889 [174 Cal.Rptr. 257] for the proposition that the analysis is one involving foreseeability of harm. We disagree with his characterization of the issue. In *Nichols*, the court's analysis of foreseeability in the context of duty was necessary because the attorney defendants argued they undertook only a narrow employment—to represent their client in a workers' compensation matter only for specific limited purposes. (*Nichols v. Keller, supra,* 15 Cal.App.4th at p. 1684.) As indicated, here, the scope of Friedenberg's representation was clear from the retainer agreement—to prosecute all claims Piscitelli had against Prudential. The issue is not whether Friedenberg owed Piscitelli a duty to obtain a copy of the class action settlement and timely opt Piscitelli out of the class action, but whether Friedenberg breached his duty to exercise ordinary skill and care in handling Piscitelli's claims against Prudential by failing to investigate the class action and opt Piscitelli out of its settlement. (See, e.g., *Unigard Ins. Group v. O'Flaherty & Belgum, supra,* 38 Cal.App.4th at p. 1237 [45 Cal.Rptr.2d 565] ["The standard of care in attorney malpractice is clear. In determining whether the O'Flaherty law firm used the requisite competence in handling Unigard's lawsuit, the crucial inquiry is whether their advice and actions were so legally deficient when given that it demonstrates a failure to use such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in performing the tasks they undertake."].) *Davis v. Damrell* is wrongly interpreted as stating its rule in terms of duty as opposed to breach. The *Davis* court said, "While we recognize that an attorney owes a basic obligation to provide sound advice in furtherance of a client's best

---

[9]BAJI No. 6.37 provides: "An attorney, performing professional services for a client, owes that client the following duties of care: [¶] (1) The duty to have that degree of learning and skill ordinarily possessed by reputable attorney [*sic*] practicing in the same or a similar locality and under similar circumstances; [¶] (2) The duty to use the care and skill ordinarily exercised in like cases by reputable members of the profession practicing in the same or a similar locality under similar circumstances; and [¶] (3) The duty to use reasonable diligence and his best judgment in the exercise of skill and the application of learning. [¶] A failure to perform any one of these duties is negligence."

interests [citation], such obligation does not include a duty to advise on all possible alternatives no matter how remote or tenuous." (*Davis v. Damrell, supra,* at p. 889.) An examination of the cases relied upon by *Davis* make clear its statement is appropriately interpreted in terms of breach. (See, e.g., *Smith, supra,* 13 Cal.3d at p. 362 [holding an attorney dealing in an unsettled area of the law has a duty to undertake reasonable research in an effort to ascertain relevant legal principles and to make an informed decision as to a course of conduct based upon an intelligent assessment of the problem; evidence of the defendant's failure to perform such adequate research and inability to exercise the necessary informed judgment (the *breach* of duty by such an attorney) justified the court's denial of defendant's motion for nonsuit and JNOV]; *Sprague v. Morgan* (1960) 185 Cal.App.2d 519, 523 [8 Cal.Rptr. 347] [holding, in terms of duty, that the degree of the care and skill for a lawyer is only that which a lawyer of ordinary skill and capacity commonly shows and exercises and stating, in terms of breach, " '[i]t has frequently been held that a lawyer is not liable for lack of knowledge as to the true state of the law where a doubtful or debatable point is involved' "].)[10]

The real issue raised by Friedenberg is one of fact, involving primarily a determination of whether Friedenberg was aware of the class action and its proposed settlement before the October 30, 1995 opt-out date.[11] The question of whether Friedenberg failed to conform to the standard of care of a reasonably competent attorney under the circumstances was the subject of extensive expert testimony. In this case, where reasonable minds would differ on whether Friedenberg met or breached the requisite standard of care, such testimony was appropriately presented to the jury. (See, e.g., *Gerard v.*

[10]Even if we were to characterize the issue as one of duty, we would find a duty on Friedenberg under the circumstances. Viewing the evidence in Piscitelli's favor, as we must in assessing propriety of denial of JNOV (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 284 [73 Cal.Rptr.2d 596]; *Shapiro v. Prudential Property & Casualty Co.* (1997) 52 Cal.App.4th 722, 730 [60 Cal.Rptr.2d 698]), it indicates Friedenberg became aware of Piscitelli's status as an investor shortly after his assignment to the case, learned of the existence of the investor class action through newspaper articles and conversations with Attorney Dreher, and learned of an upcoming deadline in the investor class action through a conversation with Piscitelli. A reasonably prudent attorney would foresee the probability of broad settlement language and would obtain a copy of the settlement notice and settlement agreement to investigate whether the class action settlement might encompass claims of investors unrelated to merely investment losses. Had such an attorney done so, he or she would have, as a matter of precaution, opted his or her client out of the class in order to preserve non-investment-related claims.

[11]Friedenberg does not admit to having knowledge of the class action's pendency or the class settlement notice on appeal, heavily disputed issues at trial. He only argues that even if he had obtained the class settlement notice documents, they were insufficient as a matter of law to impart notice that Piscitelli's claims were at risk. We do not construe this argument as admitting notice of the class action or its proposed settlement.

*Ross* (1988) 204 Cal.App.3d 968, 988 [251 Cal.Rptr. 604] ["[t]o determine the validity of [a legal malpractice] allegation, the trier of fact is entitled to the benefit of expert evidence as to the proof of the prevailing standard of skill and learning in the same or similar locality and the propriety of particular conduct by the practitioner"]; *Lipscomb v. Krause* (1978) 87 Cal.App.3d 970, 975 [151 Cal.Rptr. 465]; *Wright v. Williams* (1975) 47 Cal.App.3d 802, 808-809 [121 Cal.Rptr. 194].)

## IV. *Damages Consisting of Lost Commissions on Managed Accounts*

 Having concluded Friedenberg is entitled to a new trial on liability and, necessarily, damages, we address his contentions regarding the propriety, as a matter of law, of Piscitelli's claims for lost future commissions.

Friedenberg first contends the Workers' Compensation Act (Lab. Code, § 3200 et seq.) provides the exclusive remedy for Piscitelli's claims that he lost commissions on his largest money management account, the David Jones account. Specifically, Friedenberg argues the evidence demonstrates Piscitelli's lost commissions, if any, were caused solely by Piscitelli's depression and consequent medical leave of absence, not by damage to his CRD caused by Prudential's fraud.

Under the Workers' Compensation Act, employees are automatically entitled to recover benefits for injuries "arising out of and in the course of the employment." (Lab. Code, § 3600, subd. (a); *Privette v. Superior Court* (1993) 5 Cal.4th 689, 697 [21 Cal.Rptr.2d 72, 854 P.2d 721].) "When the conditions of compensation exist, recovery under the workers' compensation scheme 'is the exclusive remedy against an employer for injury or death of an employee.'" (*Privette*, at p. 697.) The exclusive remedy provisions of the Workers' Compensation Act, however, "are intended to effectuate and implement the fundamental '[employment] compensation bargain' said to underlie the workers' compensation scheme. Where the [employee's] injury is a result of conduct, whether in the form of discharge or otherwise, not seen as reasonably coming within the compensation bargain, a separate civil action may lie." (*Shoemaker v. Myers* (1990) 52 Cal.3d 1, 20 [276 Cal.Rptr. 303, 801 P.2d 1054, 20 A.L.R.5th 1016]; see also *Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24 Cal.4th 800, 811 [102 Cal.Rptr.2d 562, 14 P.3d 234] (*Vacanti*).)

In determining whether a cause of action against an employer comes within the scope of workers' compensation exclusivity, we initially determine whether the alleged injury falls within the scope of the exclusive remedy provisions. (*Vacanti, supra,* 24 Cal.4th at p. 811.) "Where the

alleged injury is 'collateral to or derivative of' an injury compensable by the exclusive remedies of the [Workers' Compensation Act], a cause of action predicated on that injury may be subject to the exclusivity bar. [Citation.] Otherwise, the cause of action is not barred. [¶] If the alleged injury falls within the scope of the exclusive remedy provisions, then courts consider whether the alleged acts or motives that establish the elements of the cause of action fall outside the risks encompassed within the compensation bargain. '[I]n some exceptional circumstances the employer is not free from liability at law for his intentional acts even if the resulting injuries to his employees are compensable under workers' compensation.' [Citation.] Where the acts are 'a "normal" part of the employment relationship' [citation], or workers' compensation claims process [citation], or where the motive behind these acts does not violate a 'fundamental policy of this state' [citation], then the cause of action is barred. If not, then it may go forward." (*Id.* at pp. 811-812.)

Applying these principles, we conclude the court correctly permitted Piscitelli to present evidence on his claim for lost commissions on the Jones account. Piscitelli's claimed injury is economic. Even assuming those economic damages are collateral to or derivative of depression caused by Piscitelli's loss of the Jones account, arguably a "compensable injury" (*Vacanti, supra,* 24 Cal.4th at p. 813),[12] the alleged injury falls outside the risks encompassed within the compensation bargain because there was evidence from which a jury could find Piscitelli lost the Jones account as a consequence of events, including his depression and negative marks on his CRD, stemming from Prudential's intentional misrepresentations regarding the limited partnership investments. The compensation bargain cannot " 'encompass conduct, such as sexual or racial discrimination "obnoxious to the interests of the state and contrary to public policy and sound morality." ' [Citation.]" (*Fermino v. Fedco, Inc.* (1994) 7 Cal.4th 701, 715 [30 Cal.Rptr.2d 18, 872 P.2d 559].) Extrinsic fraud, like harassment, is "not conduct of a type necessary for management of the employer's business." (*Reno v. Baird* (1998) 18 Cal.4th 640, 646 [76 Cal.Rptr.2d 499, 957 P.2d 1333].) The Legislature never intended that an employer's fraud be

---

[12]"An injury is compensable for exclusivity purposes if two conditions exist. First, the statutory conditions of compensation must concur. (See § 3600, subd. (a).) For example, if the injury arises 'out of and in the course of the employment, the exclusive remedy provisions apply notwithstanding that the injury resulted from . . . intentional conduct . . . even though the . . . conduct might be characterized as egregious.' [Citation.] [¶] Second, the injury must cause a 'disability or the need for medical treatment.' [Citation.] ' "Injury" includes any injury or disease . . . .' (§ 3208.) Therefore, 'the exclusive remedy provisions apply *only* in cases of such industrial personal injury or death,' and the workers' compensation system subsumes all statutory and tort remedies otherwise available for such injuries. [Citation.]" (*Vacanti, supra,* 24 Cal.4th at pp. 813-814.)

encompassed within the risk of employment. (*Ramey v. General Petroleum Corp.* (1959) 173 Cal.App.2d 386, 402-403 [343 P.2d 787] [holding workers' compensation does not bar cause of action for fraudulent deprivation of claim against a third party; "[W]e do not believe that an injury caused by the employer's fraud arises out of the employment nor is it proximately caused by the employment as those terms are used in the statute"], cited with approval in *Johns-Manville Products Corp. v. Superior Court* (1980) 27 Cal.3d 465, 475-476 [165 Cal.Rptr. 858, 612 P.2d 948, 9 A.L.R.4th 758].)

Piscitelli's medical expert, David Braff, M.D., testified Piscitelli's major depressive disorder and resultant disability stemmed in part from complaints and threats by his clients over the failure of the limited partnership investments, Piscitelli's legal difficulties over the failing investments and his feelings of abandonment and betrayal by Prudential. Dr. Braff testified he thought Piscitelli's depression would lift if his CRD were cleared and Piscitelli could return to securities work: "[T]he disability flows from . . . the clouded CRD that he has that makes it impossible for him to work." Bruce Dunbar, the representative for the David Jones account, testified he had no criticism of Piscitelli's handling of the account while he was with Prudential; that until Piscitelli went on medical leave he had been doing a "great job" on the account. However, Dunbar stated he took the David Jones account from Prudential after Piscitelli left for medical leave for several reasons: "Number one . . . there was really no broker on the account. There might have been technically a broker on the account but it certainly wasn't a broker who believed in the account, who I had any kind of relationship with, or that demonstrated to me any type of real professionalism. . . . That combined with the fact that [Piscitelli] was no longer available combined with the fact that Prudential was getting a horrendous amount of bad publicity at the time; a number of my clients were asking me about what was going on, you know, it was supposed to be the rock, so to speak, and the rock seemed to be crumbling and, you know, there were bad headlines and I figured, gee, this is a losing battle so I moved the account." Dunbar further testified that if Piscitelli was working with a major brokerage firm and did not have derogatory marks on his record, he "would have [the Jones account] with him today." To the extent Piscitelli's loss of the Jones account resulted from events caused by Prudential's fraud, Piscitelli would not be barred under the Workers' Compensation Act from seeking those damages against Prudential.

Friedenberg alternatively contends Piscitelli's claim for lost future commissions on money management accounts is speculative as a matter of law. Piscitelli's damages expert, Dr. Formuzis, projected that if Piscitelli were working for Prudential and continued to handle the David Jones

account, he would have made $5,884,000. That conclusion was based on the assumptions that (1) Piscitelli would have retained the David Jones account and other money management accounts that he actually handled at the time he became disabled; (2) another $25 million would have been added to the David Jones account in January 1997; and (3) the account would have grown to $50 million by July of 1998 due to increases in value and additional accounts. Friedenberg argues Formuzis's first assumption is "baseless" because "there is nothing in the record to support the assumption Piscitelli lost the [David Jones] account due to anything other than his medical disability," and the remaining assumptions are "pure speculation."

Whatever its measure in a given case, it is fundamental that "damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery. [Citations.]" (*Frustuck v. City of Fairfax* (1963) 212 Cal.App.2d 345, 367-368 [28 Cal.Rptr. 357]; see also *Mozzetti v. City of Brisbane* (1977) 67 Cal.App.3d 565, 577 [136 Cal.Rptr. 751] ["It is black-letter law that damages which are speculative, remote, imaginary, contingent or merely possible cannot serve as a legal basis for recovery"].) However, recovery is allowed if claimed benefits are reasonably certain to have been realized but for the wrongful act of the opposing party. (*Williams v. Krumsiek* (1952) 109 Cal.App.2d 456, 459 [241 P.2d 40].)

Piscitelli's claim for lost commissions is analogous to that for lost profits due to interruption of an established business. In *Fibreboard Paper Products Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675 [39 Cal.Rptr. 64], the court set forth the general principles relating to recovery of such anticipated profits: "It is well established in California . . . [tort] damages may include loss of anticipated profits where an established business has been injured. [Citations.] The basis of this principle is that where the operation of an established business is prevented or interrupted by a tort, damages for loss of prospective profits, that otherwise might have been made from its operation, are ordinarily recoverable for the reason that their occurrence and extent may be ascertained with reasonable certainty from the working experience of the business, from the past volume of business, and other provable data relevant to the probable future sales. [Citations.] Concomitant with this principle is the rule that the award for damages for loss of profits depends upon whether there is a satisfactory basis for estimating what the probable earnings would have been had there been no tort. [Citation.] If no such basis exists, it may be necessary to deny such recovery, but if, however, there has been an operating experience sufficient to permit a reasonable estimate of probable income and expense, damages for loss of profits are awarded. [Citations.] While the courts have often noted the difficulty of proving the amount of loss of profit, they have also recognized

that a defendant cannot complain if the probable profits are of necessity estimated, the rationale being that it was the defendant himself who prevented the plaintiff from realizing profits. [Citation.] Accordingly, it is clear from the cases that the general principle inherent in the recovery of damages for loss of prospective profits is that the evidence must make reasonably certain their nature, occurrence and extent. In sum, such evidence must be of reasonable reliability. [Citation.]" (*Id.* at pp. 702-703, italics omitted.)

We cannot say Piscitelli's claim for lost commissions is entirely speculative as a matter of law. Dr. Formuzis's testimony demonstrated a portion of Piscitelli's projected commissions to a reasonable certainty. Dr. Formuzis's first assumption—that Piscitelli would have retained the money management accounts he held before his disability—was supported by Dunbar's testimony that Piscitelli would have the account today with the same percentage fee if his CRD were cleared and he was with a major brokerage house. Formuzis's second assumption is supported by Dunbar's testimony that by January 1997 a sum of money in the range of $22 million to $25 million was added to the account. Piscitelli's recovery of commissions on that increased amount of money was dependent on Dunbar's testimony that Piscitelli would have kept the account. Such testimony, combined with Dr. Formuzis's standard arithmetic calculations as to the percentage commission and present value discounts, provided a reasonable basis to calculate Piscitelli's lost commissions.

The same is not true for Dr. Formuzis's assumption that the account would have grown to approximately $50 million by July 1998. Piscitelli has pointed to no evidence on which Dr. Formuzis's supposition was based, and we cannot ascertain with any certainty how he reached that assumption. Consequently, we conclude Piscitelli's claim for lost commissions was speculative as a matter law to the extent it was based on Dr. Formuzis's third assumption.

#### DISPOSITION

The judgment is reversed. Friedenberg is to recover his costs on appeal.

Benke, Acting P. J., and McIntyre, J., concurred.