Filed 6/24/14  P. v. Waterman CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G049909 |
| v. | (Super. Ct. No. RIF10005797) |
| MARYBETH WATERMAN, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Riverside County, Gary B. Tranbarger, Judge.  Judgment affirmed.

Richard L. Fitzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Kimberley A. Donohue, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

A jury convicted defendant Marybeth Waterman of three counts of grand theft (Pen. Code, § 487, subd. (a); counts 1, 3, and 5)[1] and three counts of diversion of construction funds (§ 484b; counts 2, 4, and 6). The jury found true the allegations defendant took over $200,000 (§ 12022.6, subd. (a)(2)) as to counts 1, 2, 3, 4, and 6, and over $65,000 (§ 12022.6, subd. (a)(1)) as to counts 2, 4, 5, and 6, and that she committed multiple felonies involving the taking of over $500,000 (§ 186.11, subd. (a)(2)) as to all counts. The court sentenced her to six years eight months in prison.

On appeal defendant contends the court violated her constitutional rights to a fair trial and to present a defense when it excluded an expert's opinion that her conduct was legal based on generally accepted business practices in the interior design industry. She also contends the prosecutor improperly commented in his closing argument on her right not to testify. We disagree with both contentions and affirm the judgment.

FACTS

Defendant is an interior designer who owned an interior design company in Rancho Mirage named Studio Waterman. In 2006, Studio Waterman had cash flow problems. It lost its $250,000 line of credit and could not obtain a new line of credit from any other bank. Defendant made decisions about which client purchase orders would be fulfilled from the available funds.

By February or March of 2007, Studio Waterman had $700,000 to $800,000 in unfunded liabilities and lacked sufficient funds to finish its current jobs. Its accountant suggested defendant move to a less expensive office building, cut down staff, or find new clients. Defendant refused.

---

[1] All statutory references are to the Penal Code.

2

The company's financial condition worsened. Its accountant gave defendant monthly reports on the company's financial condition, including the outstanding balances on clients' accounts.

At this point, Studio Waterman had only three or four clients, including the Pharrises (Gerald and Lynn), the Berlins (James and Madeline), and the Wiltzes (James and Jane). Studio Waterman used much of the money paid by these clients to pay the company's operating expenses, to advance other clients' projects, to pay defendant, or to pay credit card charges for personal expenses, such as "high end women's clothing and accessories, payments to a plastic surgeon, hair salon and spa treatment charges, entertainment, travel at very high end . . . first class hotels, limousines, and international travel." Between 2006 and 2009, Studio Waterman paid defendant around $640,000.

*The Pharrisses*

In 2006, the Pharrises hired defendant to provide interior design services for a house they were building in Indian Wells. The contract required the Pharrises to pay defendant (1) the wholesale cost of furniture and fixtures listed in letters of estimate, and (2) a 35 percent markup as defendant's design fee. Of this, the Pharrises were to pay defendant an upfront deposit equal to 20 percent of the total amount of any letter of estimate. Between June 2008 and July 2009, the Pharrises paid defendant almost $1.3 million. Defendant and one of her employees falsely claimed to have ordered all the items for which the Pharrises had paid.

In August 2009, the Pharrises learned from their general contractor that defendant had not ordered the cabinets for their house. The Pharrises tried to contact defendant by cell phone, land line, and e-mail. About two weeks later, she finally answered the phone. In a meeting on August 24, 2009, defendant told the Pharrises that her business had started declining right when the Pharrises started making their major payments to her, that she had commingled their payments with her company accounts,

3

and that their money was gone and had been used to pay for other people's furniture. Defendant said she was out of money, she had let her staff go, and she was paying her overhead with her clients' money. Gerald Pharris accused defendant of committing fraud and she agreed. She offered to give the Pharrises some money she had received from other clients for her design fees, but Gerald Pharris refused to accept it. He reported defendant to the authorities because he did not want defendant to do this to anyone else. The total loss suffered by the Pharrises was about $1.1 million.

*The Berlins*

In 2006, the Berlins hired defendant to provide interior design services for a New York City apartment they were renovating. Pursuant to a letter of estimate, they paid defendant deposits for items she purportedly ordered for them at her wholesale cost, as well as defendant's design fee equal to a 35 percent markup. They also paid her travel expenses.

In July 2009, a subcontractor informed the Berlins that progress on the apartment had stalled because defendant failed to deliver all the wall paper the Berlins had ordered. An employee of defendant e-mailed the Berlins that the wall paper would be shipped out. In August 2009, defendant claimed to be on vacation and in a "no cell zone," and also that she had visited the apartment and it was not in a ready condition for the wall paper.

On August 18, 2009, James Berlin e-mailed defendant that the Berlins would proceed to take necessary action. The next day, defendant phoned him and acknowledged she had not ordered all the items she had claimed to. She said "her business had been bad and she had used the money for other things and that she was hoping that the next project would provide money for this project, but there was no next project." The Berlins suffered a loss of around $600,000 to $650,000.

4

*The Wiltzes*

In the spring of 2007, the Wiltzes hired defendant to provide interior design services for a house they were building in Indian Wells. Pursuant to a letter of estimate, the Wiltzes paid defendant deposits for items she purportedly ordered for them, as well as her service charge equal to a 35 percent markup. In August 2009, defendant told them she did not have the money to pay the balance owing to vendors for some items for which the Wiltzes had already paid, and that they would need to pay the vendors directly. Defendant said she had lost a line of credit and was having financial difficulties. The Wiltzes suffered a loss of around $300,000.

*Defense*

A forensic accountant testified that Studio Waterman's books and records showed that some money was paid to defendant (or paid toward her credit card charges for personal expenses) to repay her for around $780,000 in loans she had made to the company in 2004 and 2005. The company repaid defendant in full for those loans by May 31, 2008. Studio Waterman owes the Pharrises, the Berlins, and the Wiltzes about $1.7 million.

Character witnesses opined that defendant is honest, trustworthy, and honorable.

DISCUSSION

*The Court Did Not Abuse Its Discretion by Excluding Certain Expert Testimony*

Defendant contends the court abused its discretion by excluding evidence she acted within acceptable industry norms and lacked the specific intent required for grand theft. She argues the court thereby violated her due process right to a fair trial and her right to present a defense.

5

Prior to trial, the People moved for a court ruling that "[e]vidence relating to the common practice in the interior design or construction industry is not relevant and should not [be] admitted into evidence." At a pretrial hearing, the court and counsel for both parties placed on the record some issues they had discussed in chambers. The prosecutor stated, "Then I believe we also discussed evidence relating to the defense bringing in an expert in the interior design industry would not be admitted and not be relevant as to the practices." The court stated, "That's overbroad. Generally speaking, that is correct. But I didn't exclude all possibility of someone experienced in the industry giving the jury some useful information. What we discussed was whether or not that person could at all give an expert opinion about the legality of certain activity, whether or not it was legal or not legal, and that it is certainly going to become clear to the jury and everyone in this trial that defense is not a defense, and if it's simply being presented in furtherance of that kind of defense it won't be permitted." The prosecutor replied, "Okay," thereby acknowledging he understood the court's ruling.

The court did not abuse its discretion by excluding expert testimony on the *legality* of defendant's conduct. (*People v. McDowell* (2012) 54 Cal.4th 395, 426 [court's decision on admissibility of expert testimony reviewed for abuse of discretion].) Expert opinion on a question of law is inadmissible (*Summers v. A.L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1178), as is expert opinion that "invades the province of the jury to decide a case" and "'"amounts to no more than an expression of his general belief as to how the case should be decided . . . ."'" (*Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 972; see also *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 82).

Defendant contends her trial counsel reasonably misunderstood the court's ruling. She asserts that, regardless of how the court's order is "characterized," "defense counsel never called an industry expert to testify as to common industry accounting, fulfillment and banking practices because he, like everyone other than [plaintiff], reasonably understood the court's ruling as prohibiting him from doing so." But the

6

court and the prosecutor understood the ruling. Apparently, only defense counsel was confused. Defendant cites no support in the record (or any other support) for his assertion that his misunderstanding of the court's ruling was reasonable. Moreover, defense counsel could have asked the court on the record to clarify its ruling. He failed to do so.

Next, defendant complains that the court improperly limited defense counsel's cross-examination of prosecution witness George Kline, who was *not* an expert, but rather an employee of Studio Waterman from the spring of 2008 to August 2009. During that time, Kline's primary responsibility at Studio Waterman was "UPS," as well as "additional general office functions," such as assisting other staff members and filing.

On cross-examination, defense counsel elicited, with no objection from the prosecutor, Kline's testimony that he had worked in the design industry prior to his employment at Studio Waterman, and that, based on his prior experience and knowledge and what he observed at Studio Waterman, he did not believe he had committed any criminal conduct or had assisted anyone else's criminal conduct.

Shortly thereafter, the following colloquy ensued.

Q. [BY DEFENSE COUNSEL]: "The sense that one gets in listening to your testimony about conversations and about interaction and then in these e-mails is a couple of things. One, this is a legitimate business that is functioning, that is providing services to numerous clients.

A. Yes.

Q. When you think about, you know, shams or Ponzi schemes or these grand sort of shell companies, one thinks of a purported business that is providing no service."

[The court properly sustained the prosecutor's objection to this statement.]

Q. [BY DEFENSE COUNSEL]: "Was this that type of business?" The court called a sidebar conference, after which defense counsel moved on to another line of questioning.

7

On appeal defendant contends the court improperly excluded Kline's testimony "about whether Studio Waterman was a Ponzi scheme which provided no actual service." The court did not abuse its discretion by doing so. Defense counsel's question concerning shams, Ponzi schemes, and shell companies went to the legality of defendant's business. Furthermore, the testimony would have been cumulative. Kline testified that the other employees of Studio Waterman included an architect, two graphic artists, an office manager, project managers, an in-house bookkeeper, a secretary/receptionist, and a computer specialist. His testimony concerning Studio Waterman's employees and its daily activities revealed the company provided actual interior design services to various clients. For example, Kline testified that money was spent on projects for other clients and that vendors (who had provided merchandise) pressured Studio Waterman for payment. Moreover, the court granted defense counsel very generous latitude in cross-examining Kline, even allowing Kline to testify he did not believe any criminal conduct "was going on" at Studio Waterman.

Defendant's second contention concerning Kline's testimony is that the court improperly precluded Kline from testifying about defendant's "business intent during the economic downturn." The court did not abuse its discretion. Kline had no personal knowledge of defendant's intent. Furthermore, whether defendant had the requisite intent for grand theft was a question for the jury.

Finally, defendant contends the court improperly precluded Kline from testifying "about litigation against a former client that owed a great deal of money to Studio Waterman." But Kline was not familiar with the subject; defense counsel had to educate him by saying (in the guise of a question), "Hitchcock was actually a litigation matter that Studio Waterman had against a prior client that had not paid a whole lot of money." The court did not abuse its discretion when it sustained the prosecutor's relevance objection. Hitchcock's debt to defendant was irrelevant to whether defendant committed grand theft and diversion of construction funds against the Pharrises, the

8

Berlins, and the Wiltzes.  And since Kline was unfamiliar with the litigation, it is unclear what he could have testified about it (other than to respond to defense counsel's educational question/statements).

In sum, the court did not abuse its discretion and did not violate defendant's constitutional rights to a fair trial and to present a defense.  A state's evidentiary rules generally do not abridge an accused's right to present a defense.  (*People v. Cunningham* (2001) 25 Cal.4th 926, 999; *United States v. Scheffer* (1998) 523 U.S. 303, 308.)  Nor does a court abuse its discretion by precluding defense counsel from cross-examining a witness about cumulative evidence.  (*Cunningham*, at p. 999.)  There was no error.

*The Prosecutor Did Not Improperly Comment on Defendant's Failure to Testify*

During closing argument, the prosecutor argued that defendant intended to commit grand theft.  He then immediately commented on defendant's right not to testify: "Let's move to a few different categories in terms of how you evaluate evidence.  First, let's start with the defendant's right not to testify.  Miss Waterman has a right not to testify.  You cannot hold that against her.  In fact, you can't even talk about it during your deliberations. There's a — and you can't consider it for any reason.  [¶]  There's a law school professor one time that told me, you know, if you've got a right but you get penalized when you exercise that right, well what good is the right?  So she didn't testify in this case, and you can't consider that — for any purpose."  The court overruled defense counsel's objection.

Outside the jury's presence, defense counsel elaborated on his objection: "I'm sure [the prosecutor's] intent was not to educate the jury on why we have a right not to testify, but rather to highlight the fact that there is a right not to testify and it was invoked in this case.  [¶]  I was surprised by the comment . . . .  I've never heard a Government prosecutor previously comment on the theory behind no comment on the

9

Fifth Amendment. And so I thought it was an appropriate *Griffin* objection." The court again overruled the objection.

On appeal defendant contends the prosecutor implied to the jury that her "failure to testify was evidence that she had the specific intent to steal . . . ."

In *Griffin v. California* (1965) 380 U.S. 609, 611-615 (*Griffin*), "the United States Supreme Court held that the privilege against self-incrimination of the Fifth Amendment prohibits any comment on a defendant's failure to testify at trial that invites or allows the jury to infer guilt therefrom, whether in the form of an instruction by the court or a remark by the prosecution." (*People v. Clair* (1992) 2 Cal.4th 629, 662.) In *Griffin*, the prosecutor "made much of" the defendant's failure to testify, and argued that the defendant would know details such as whether the victim looked "'beat up'" when they went down an alley together. (*Griffin*, at p. 610.) The prosecutor argued: "'These things he has not seen fit to take the stand and deny or explain.'" "'And in the whole world, if anybody would know, this defendant would know.'" "'Essie Mae is dead, she can't tell you her side of the story. The defendant won't.'" (*Ibid.*)

Similar blatant references to the defendant's failure to testify appear in the case law. They "include remarks that the defendant 'has been very quiet' during trial; 'where is the outcry of innocence?'; 'Ask the defendant to explain these things'; 'What other witnesses could the defendant's case have put forward who were totally available to you?' spoken while the prosecutor gestured toward the defendant; 'He could have taken the stand and explained it to you'; 'Only Mr. Harris [the victim] and this defendant were present at those initial meetings and we have brought you the testimony of Mr. Harris'; 'If there are reasons why innocent people do not testify before the court, I do not know what they would be.' 'There is only one person that can tell you [what happened], and that's the defendant.'" (Gershman, Prosecutorial Misconduct (2d ed.) 11:12, fns. omitted.)

10

"Prosecutorial comment which draws attention to a defendant's exercise of his constitutional right not to testify, and which implies that the jury should draw inferences against defendant because of his failure to testify, violates defendant's constitutional rights."  (*People v. Murtishaw* (1981) 29 Cal.3d 733, 757, superseded by statute on another point as recognized in *People v. Boyd* (1985) 38 Cal.3d 762, 772-773.)

In *People v. Carter* (2005) 36 Cal.4th 1114, 1190, defense counsel, in closing argument, acknowledged that the defendant did not testify, admonished the jurors they could not "'hold it against him'" or "'consider any of it,'" and "hypothesized a number of reasons why a defendant might elect not [to] testify."  (*Id*. at p. 1190.)  Our Supreme Court held there was no *Griffin* error because the remarks, considered in context, showed "that counsel was not suggesting that the jury draw any sort of adverse inference from defendant's silence."  (*Carter*, at p. 1192.)  The attorney's admonishments that the jury could not consider the defendant's silence, or hold it against him, "manifestly did not constitute the type of comments that *Griffin* declared invalid."  (*Ibid.*)

In *People v. Bradley* (2012) 208 Cal.App.4th 64, a prosecutor "stated '[t]here was no valid explanation given by the [defendant] as to why the public could not see the actual credit card statements,'" which comment elicited a defense motion for a mistrial on *Griffin* grounds.  (*Bradley*, at p. 85.)  The trial court denied the motion.  (*Ibid.*)  The prosecutor then told the jury that the defendant had a constitutional right not to testify and "the jury could not draw an inference from the fact that [he] did not testify because he was 'entitled to just sit in that chair on his constitutional right and not say anything.'"  (*Ibid.*)  The prosecutor explained to the jurors that, when he previously commented on the defendant's failure to explain why the credit card statements were private, the prosecutor had *not* been talking about the defendant's choice not to testify.  (*Id.* at pp. 85-86.)  Defense counsel then "renewed his motion for mistrial on the basis of the prosecutor's 'intentional' misconduct in 'commenting on [the defendant's] right to take the Fifth Amendment.'  The [trial] court again denied [the defense] motion for

11

mistrial, finding the prosecutor's comments did no more than paraphrase instructions the court had already given the jury." (*Id.* at p. 86.)

The Court of Appeal held there was no *Griffin* error. (*People v. Bradley*, *supra*, 208 Cal.App.4th at p. 86.) As to the prosecutor's comments "that the jury should not draw any adverse inferences from [the defendant's] failure to testify, the trial court properly denied the motion for mistrial. The prosecutor merely paraphrased the language of CALJIC Nos. 2.60 and 2.61, which had already been read to the jury, and explained he did not mean to suggest the jury should draw any adverse inference from [the defendant's] failure to testify. [¶] Even if the prosecutor's references to [the defendant's] constitutional right not to testify can be regarded as error, '"indirect, brief and mild references to a defendant's failure to testify, without any suggestion that an inference of guilt be drawn therefrom, are uniformly held to constitute harmless error."'" (*Ibid.*)

Here, too, the prosecutor's remarks paraphrased the court's jury instruction on the subject.[2] As in *People v. Carter*, *supra*, 36 Cal.4th 1114, the prosecutor reminded the jurors they could *not* talk during deliberations about defendant's right not to testify or consider it for any reason.

But defendant argues the prosecutor's remarks were not meant to be educational, but "were, at best, unnecessary and reckless, and, at worst, intentionally

---

[2] The court instructed the jury with CALCRIM No. 355 as follows: "A defendant has an absolute constitutional right not to testify. She may rely on the state of the evidence and argue that the People have failed to prove the charges beyond a reasonable doubt. Do not consider for any reason at all the fact that the defendant did not testify. Do not discuss that fact during your deliberations or let it influence your decision in any way."

12

unconstitutional." Defendant notes the court had already instructed the jury on the subject and that defense counsel surely intended to do so in his closing argument.[3]

"The test on review is whether there is a reasonable likelihood that the jury misconstrued or misapplied the words in violation of the privilege against self-incrimination." (Levenson, Cal. Crim. Proc. (The Rutter Group 2013) ¶ 23:45, p. 23-51; *People v. Clair*, *supra*, 2 Cal.4th at pp. 662-663.) It is not reasonably likely the jury did so here. The prosecutor's comments paraphrased the court's instructions to the jury. Jurors are "presumed to have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) Indeed, the prosecutor's comments reminded the jury they could not discuss or consider in their deliberations that defendant did not testify.

In any event, the prosecutor's remarks on defendant's right not to testify were brief, mild, and not the type of comments *Griffin* declared invalid. "[I]ndirect, brief and mild references to a defendant's failure to testify, without any suggestion that an inference of guilt be drawn therefrom, are uniformly held to constitute harmless error." (*People v. Hovey* (1988) 44 Cal.3d 543, 572; *People v. Turner* (2004) 34 Cal.4th 406, 420-421.) Although the prosecutor's comments were probably ill advised, inviting scrutiny on appeal, it was not error to paraphrase the court's own instruction, and, in any

_____

[3] As to the prosecutor's intent, this was not the first time in his closing argument that he gave the jurors an educational admonishment. Earlier, he had noted that Studio Waterman employees had testified pursuant to immunity agreements: "[C]ommon sense will tell you, Well, why is [defendant] charged and not these people? Good question. But as you heard in the jury instruction, that isn't something for you to consider. So I understand you might be curious about it. You might think, well is it fair or not? But as a jury sitting in judgment of [defendant's] actions, you have to put that issue completely aside and just judge [defendant's] actions." These comments highlighted the issue for the jury. But clearly the prosecutor had no nefarious intent, since it was not in the prosecution's interest for the jury to speculate about the employees' culpability and to consider whether it was fair that defendant was singled out for prosecution.

13

event, was harmless beyond a reasonable doubt.  (*Hovey*, at p. 572 [standard for prejudice for *Griffin* error is harmless beyond a reasonable doubt].)

DISPOSITION

The judgment is affirmed.

IKOLA, J.

WE CONCUR:

RYLAARSDAM, ACTING P. J.

BEDSWORTH, J.

14