Filed 8/13/15  Bond v. HTrans Inc. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| CRAIG P. BOND et al., | D064668 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. 37-2009-00079365-CU-PA-SC) |
| HTRANS INC., et al., | |
| Defendants, Cross-complainants and Appellants; | |
| OVERLAND TRANSPORT AND LOGISTICS, INC., et al., | |
| Defendants, Cross-complainants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, Frederic L. Link, Judge.  Affirmed.

White, Oliver & Amundson, Daniel M. White, Steven G. Amundson, Adam S. Shiells and Heather N. Catron for Defendants, Cross-complainants and Appellants.

Horton, Oberrecht, Kirkpatrick & Martha and Kimberly S. Oberrecht for Defendants, Cross-complainants and Respondents.

Lewis, Brisbois, Bisgaard & Smith, Jeffry A. Miller, Lann G. McIntyre; Hanna, Brophy, MacLean, McAleer & Jensen and Brenna E. Hampton for Intervener and Respondent.

This is an appeal from a final judgment after a jury trial on the bifurcated issue of liability followed by a stipulated settlement on the issue of damages in the underlying lawsuit for personal injuries to plaintiff Craig P. Bond. Bond and his wife, Ginger (together, plaintiffs), sued two truck drivers and the companies that employed them following a multiple tractor-trailer collision on northbound Interstate 5 near Mount Shasta, California. In the liability phase of the trial, by special verdict the jury found that driver Gabriel M. Dooley was negligent, his negligence was a substantial factor in causing harm to Bond, and he was 100 percent responsible for the harm to Bond. The jury found no negligence by the other driver, Jorge A. M. Gonzalez, or by Bond and his work colleague, Richard Arlen, who were on the shoulder of the road at the time of the collision.

Dooley and his employer, Htrans, Inc. (Htrans), appeal, raising three issues related to the jury trial on the bifurcated issue of liability: (1) whether the record contains substantial evidence to support the finding that Gonzalez was not negligent; (2) whether the trial court abused its discretion in admitting lay opinion testimony from Htrans's president; and (3) whether the court abused its discretion in admitting opinion testimony

2

from plaintiffs' accident reconstruction expert, on the bases it lacked foundation and was a previously undisclosed opinion.  We will affirm.

## I.

## STATEMENT OF THE CASE

In a first amended complaint, plaintiffs named Dooley and Htrans (together, Dooley defendants); and Gonzalez and his employer, Overland Transport & Logistics, Inc. (Overland) (together, Gonzalez defendants) in multiple causes of action.  In their respective answers, the Dooley defendants and the Gonzalez defendants alleged an affirmative defense based on the negligence of plaintiffs or others.

The Dooley defendants asserted a cross-complaint against the Gonzalez defendants for indemnity and contribution, and the Gonzalez defendants asserted a cross-complaint against the Dooley defendants for indemnity and declaratory relief.

Alleging that it was Bond's employer at the time of the accident and had become liable to pay more than $250,000 to or on behalf or Bond as a result of the injuries he sustained in the collision, YRC Worldwide sought and was granted leave to intervene.

The trial court granted the Gonzalez defendants' motion to bifurcate and try the issues as to liability prior to the issues as to damages.

At trial, the parties, though counsel, presented opening statements, called witnesses, introduced evidence and gave closing arguments over eight days.  After fewer than two and one-half hours of deliberations, on April 17, 2013, the jury returned a unanimous verdict, in which it found that Dooley was negligent, his negligence was a substantial factor in causing harm to Bond, and Dooley was 100 percent responsible for

3

the harm caused to Bond.[1]  The next day, counsel for the Dooley defendants and plaintiffs advised the court that their clients had settled the damages phase of the trial.

On May 20, 2013, the court filed a "Judgment on Special Verdict" that reflects the findings described in the preceding paragraph.  Despite the settlement, plaintiffs and the Dooley defendants moved for a new trial as to liability, and the Gonzalez defendants opposed the motions.[2]  While these motions were pending, plaintiffs and the Dooley defendants entered into a written "Stipulated Verdict on Damages," by which these parties agreed that plaintiffs were entitled to a verdict on damages in the amount of $4 million — with these parties specifically reserving all rights to challenge or object to the jury's verdict on liability.

On July 26, 2013, the court denied the motions for new trial and ruled on plaintiffs' motion to tax costs.  The Gonzalez defendants then filed an amended memorandum of costs consistent with the court's ruling, following which the court filed an "Amended Judgment on Special Verdict" on July 29, 2013.  The only difference between the May 20 judgment and the July 29 amended judgment is the costs awarded to the Gonzalez defendants.

---

[1]    The special verdict form asked the jury to decide the negligence, if any, of Dooley, Gonzalez, Arlen and Bond.  The parties stipulated that, even though the verdict form would refer only to Dooley and Gonzalez, their respective employers, Htrans and Overland, would be held responsible for any liability of their respective employees.

[2]    Additionally, unrelated to any issue on appeal, plaintiffs filed and the Gonzalez defendants opposed a motion to tax costs.

4

The Dooley defendants (and later plaintiffs) appealed from the May 20 judgment, the July 29 amended judgment and the July 26 order on posttrial motions.[3] We issued an order to show cause why the Dooley defendants' appeal should not be dismissed on the basis that the amended judgment was a nonappealable interlocutory order. At the Dooley defendants' request, on October 31, 2014, the trial court filed a "Final Judgment on Special and Stipulated Judgments," which is final and appealable; and we treated their earlier notice of appeal as if it had been filed immediately after the October 31 final judgment.

Prior to preparation of the record, plaintiffs abandoned their appeal. After full briefing and our receipt of a stipulation between the Dooley defendants and YRC Worldwide, we dismissed the appeal as to YRC Worldwide, leaving only the Dooley defendants as appellants and the Gonzalez defendants as respondents.

II.

FACTS[4]

All of the pertinent facts occurred at or around 7:45 a.m. on March 4, 2009, in the northbound lanes and shoulder of Interstate 5 in Siskiyou County, near Mount Shasta, California, just south of the Dunsmuir Avenue exit on the freeway. In the hours leading

---

[3] The order denying the motion for a new trial is not directly appealable; we review it in the appeal from the judgment. (*Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 18.)

[4] "As required by the rules of appellate procedure, we state the facts in the light most favorable to the judgment." (*Orthopedic Systems, Inc. v. Schlein* (2011) 202 Cal.App.4th 529, 532, fn. 1.)

up to the accident, snow had been falling heavily, and visibility was poor. Snow plows had been working in the area, although the road was still "slick" and "slippery" and covered in parts with patches of packed snow and ice underneath. The conditions were such that, according to the California Highway Patrol officer who arrived at the scene shortly after 8:00 a.m., CalTrans would have put up temporary regulatory signs limiting the speed below what is otherwise posted — although he did not know, in fact, whether the temporary signs had been posted on that morning.

On the stretch of freeway where the incident occurred, there are two northbound lanes with, from left (west) to right (east), the center median, the fast lane (at times, No. 1 lane), the slow lane (at times, No. 2 lane), the fog line,[5] the shoulder and a guard rail. Leading up to the site of the collision, many trucks had pulled over on the shoulder, where their drivers were in various stages of installing tire chains before continuing through the CalTrans checkpoint a quarter mile to the north.

The collision involved three trucks.[6] The first, or most northerly truck, was owned by YRC Worldwide and under the control of Bond and his driving partner, Arlen (at times, the Bond truck). The Bond truck had a tractor and two trailers. At all relevant

_____

[5] From context in this case, we understand the fog line to be the painted line on the road that divides the No. 2 lane and the shoulder. (See <https://en.wiktionary.org/wiki/fog_line> ["A line painted on a road (usually bright white) that marks the edge of the legally drivable portion."] [as of Aug. 12, 2015].)

[6] Each of the trucks had a tractor and at least one trailer and are referred to throughout the proceedings and in the appellate briefs by various names (e.g., "tractor-trailers," "big rigs," etc.). Unless context requires otherwise, we will refer to each of them as a "truck."

times, it was stationary, parked entirely on the shoulder of the road between the fog line and the guard rail. At the time of the collision, Bond was between the two trailers, installing tire chains on the driver's side.

The second, or middle truck, was owned by Overland and driven by Gonzalez (at times, the Gonzalez truck). The Gonzalez truck had a tractor and a step deck, sometimes referred to as a flatbed, trailer. Around 7:45 a.m., Gonzalez pulled over on the shoulder, behind the Bond truck, in order to install tire chains. Gonzalez only stayed for 10 seconds, however, because after pulling over he realized he could not safely install chains there. After checking over his shoulder and in his mirror to make sure there was no oncoming traffic, Gonzalez pulled out into the slow lane at three to four miles per hour. A truck driver with 30 years of driving experience who was stopped on the side of the road in front of the Bond truck and witnessed the events testified that Gonzalez "was pulling out the right way" by "start[ing] out from the shoulder gradually, which is what you are supposed to do."

The third, or final, truck was owned by Htrans and driven by Dooley (at times, the Dooley truck). The Dooley truck had a tractor and a trailer. As he approached from the south, Dooley had been driving at 45 miles per hour in the slow lane, but had moved to the fast lane in order to leave as much space as possible for the trucks that had stopped on the shoulder of the road in order to install chains. Just prior to what was to become the site of the collision, Dooley returned to the slow lane and began slowing down. Meanwhile, Gonzalez already had begun to pull out from the shoulder into the slow lane. In an effort to avoid a collision, Dooley steered toward the shoulder, and the Dooley

7

truck clipped the rear passenger side of the Gonzalez truck's trailer, hit the guardrail and came to a stop as it hit the rear trailer of the Bond truck — at a time when Bond was positioned between the two trailers of the Bond truck — causing serious injury to Bond. As we introduced *ante*, the Dooley defendants settled with plaintiffs by paying $4 million.

According to Arlen, almost immediately after the collision Dooley approached him, apologized to him and said that he (Dooley) had never done anything like this before. Arlen testified that *Dooley* explained to him what had happened, as follows: While travelling at a speed of 45 miles per hour, Dooley went to downshift but missed a gear;[7] he took his eyes off the road to look at the gear shift in order to get into a gear, whereupon his truck "coughed," which Arlen understood to mean that the truck skidded; upon looking up, Dooley saw a vehicle in front of him,[8] at which point "there was nothing he could do."

A truck driver who witnessed the events from the shoulder of the road testified that, while Gonzalez was safely pulling out of the shoulder into the slow lane, Dooley was in the fast lane. Then, out of the fast lane, "all of a sudden, here comes [Dooley], and it was like he just drifted off to the right side. He didn't abruptly do it or anything

---

[7] Dooley confirmed that within 30 seconds of the collision he was driving at 45 miles per hour.

[8] This vehicle was *not* the Gonzalez truck pulling out. Dooley testified that this vehicle was a commercial truck, which he had been following for some time, that suddenly slammed on its brakes.

like that, he just kind of like slowly, surely went over to the right side[,] . . . nick[ing] the flatbed [of the Gonzalez truck] before he got all the way to the [Bond] truck."  The eyewitness testified that she saw the vehicle in front of Dooley; it did not slam on its brakes or skid, causing Dooley to veer to the right to avoid hitting it.

Another eyewitness truck driver on the shoulder of the freeway described the Dooley truck as "sliding" from the fast lane across the slow lane toward the guardrail with its brake lights on, hitting the passenger back side corner of the Gonzalez truck, then slamming into and sliding up the guardrail into the back trailer of the Bond truck.  This eyewitness was angry, because Dooley had been driving too fast — "at least 45 or [] faster" — for the conditions.

Finally, after the collision, Gonzalez approached Dooley and at trial described the exchange as follows:

"Q:      And what did you say to him?

"A:      I asked him if he was okay, and I told him[, ']too much speed.  Too much speed[,'] I told him.[9]

"Q:      And what did he say when you told him[, ']too much speed[']?

"A:      He lowered his head and did this.

"Q:      So he was nodding at you?

"A:      Correct."

In addition to the eyewitnesses, plaintiffs' accident reconstruction expert testified without objection that "as Mr. Dooley comes across lane [No. 1] towards the shoulder,

---

9        At trial, Gonzalez testified through an interpreter.

his speed was too high" and that a cause of the collision was that "Mr. Dooley's speed was too high."

III.

DISCUSSION

The trial court's judgment is " '*presumed correct*,' " and as the appealing parties, the Dooley defendants have the burden of establishing reversible error. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566, 564.) As we will explain, the record contains substantial evidence to support the jury's finding that Gonzalez was not negligent; and the Dooley defendants did not meet their burden of establishing prejudice, and thus reversible error, as a result of the admission into evidence of the challenged testimony from either Htrans's president or Bond's accident reconstruction expert.

A.      *Substantial Evidence Supports the Finding That Gonzalez Was Not Negligent*

The Dooley defendants contend that the evidence at trial *compels* the finding that Gonzalez failed to use reasonable care to avoid harm and that, because the jury found otherwise, substantial evidence does not support the verdict and, thus, the final judgment.

1.      *Standard of Review*

Our consideration whether the verdict is supported by substantial evidence is governed by a well-established standard of review:

> "In reviewing the evidence on such an appeal, all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary, but often overlooked principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury.

10

When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court." (*Crawford v. Southern Pac. Co.* (1935) 3 Cal.2d 427, 429.)

We " ' " 'must *presume* that the record contains evidence to support every finding of fact[,]' " ' " and " '[i]t is the appellant's burden . . . to identify and establish deficiencies in the in the evidence.' " (*Holguin v. DISH Network LLC* (2014) 229 Cal.App.4th 1310, 1326 (*Holguin*).)

We "look to the entire record of the appeal"; and if there is substantial evidence, "it is of no consequence that the [jury] believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874, italics deleted; see *Toyota Motor Sales U.S.A., Inc. v. Superior Court* (1990) 220 Cal.App.3d 864, 872 (*Toyota Motor Sales*) ["Where conflicting inferences may reasonably be drawn, the determination of the [jury] will be accepted on appeal even though a contrary determination would likewise be upheld."].)

"[T]he test is *not* the presence or absence of a substantial conflict in the evidence. Rather, it is simply whether there is substantial evidence in favor of the respondent. If this 'substantial' evidence is present, no matter how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631 (*Howard*).) The fact that the record may contain substantial evidence in support of an appellant's claims is irrelevant to our role, which is limited to determination of the sufficiency of the evidence *in support of the judgment actually made*. (*Ibid.*)

11

In determining the sufficiency of the evidence, we "may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to [the respondent] must be accepted as true and conflicting evidence must be disregarded." (*Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 118.) The testimony of a single witness, including that of a party, may be sufficient (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614; Evid. Code, § 411); whereas even uncontradicted evidence in favor of an appellant does not establish the fact for which the evidence was submitted (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 890). "[T]he focus is on the quality, not the quantity of the evidence." (*Toyota Motor Sales*, *supra*, 220 Cal.App.3d at p. 871.)

2.      *Analysis*

The Dooley defendants present two instances of what they argue establish Gonzalez's failure to use reasonable care as a matter of law. According to the Dooley defendants, by parking on the shoulder of the road, Gonzalez necessarily violated Vehicle Code section 21718 (section 21718), which results in a presumption that he failed to exercise due care; and, by obstructing the northbound lanes as he left the shoulder and reentered the freeway, Gonzalez necessarily failed to use reasonable care. In their presentation, however, the Dooley defendants fail to acknowledge certain evidence and inferences from evidence that support the jury's findings and to accept that the jury may have disbelieved what they contend was persuasive or even undisputed evidence.

12

a. *Section 21718 and Negligence Per Se*

Section 21718 provides in part: "(a) No person shall stop, park, or leave standing any vehicle upon a freeway which has full control of access and no crossings at grade except: [¶] (1) When necessary to avoid injury or damage to persons or property [¶] . . . [¶] (5) Where stopping, standing, or parking is specifically permitted."

The doctrine of negligence per se creates a presumption that, where there was a violation of law, the violator was negligent.[10] (*Jacobs Farm/Del Cabo, Inc. v. Western Farm Service, Inc.* (2010) 190 Cal.App.4th 1502, 1526; Evid. Code, § 669, subd. (a).) This presumption is rebuttable (*Nevarrez v. San Marino Skilled Nursing & Wellness Centre* (2013) 221 Cal.App.4th 102, 126) by proof, as applicable in this case, that "[t]he person violating the statute, ordinance, or regulation did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law . . . ." (Evid. Code, § 669, subd. (b)(1).)

In their merits briefs, the Dooley defendants argue that, because the evidence was undisputed — and the Gonzalez defendants failed to rebut — that Gonzalez parked on the shoulder of the road, he necessarily violated section 21718; and because he violated a statute, the presumption under the doctrine of negligence per se *requires* "that a directed verdict be entered as to Gonzalez's failure to use reasonable care, and that this matter be

---

[10]     "A presumption is an assumption of fact that the law requires to be made from another fact or group of facts found or otherwise established in the action. *A presumption is not evidence*." (Evid. Code, § 600, subd. (a), italics added.)

13

remanded for a new trial on the issues of causation and comparative fault as they relate to Gonzalez's conduct."

Despite the Dooley defendants' argument, none of the parties' merits briefs suggests that the case was tried on a theory of negligence per se. Our independent review of the record confirms that the jury instructions as given do not support a claim of negligence per se *based on a potential violation of section 21718*. Accordingly, we asked for and received supplemental briefing from the parties whether the Dooley defendants' failure to try the case on a negligence per se theory forfeited their appellate argument on this theory.[11] (Gov. Code, § 68081.)

In their supplemental brief, the Gonzalez defendants argue that negligence per se was not at issue at trial and that, as a result, the Dooley defendants forfeited appellate review of the issue. The Gonzalez defendants emphasize that neither the jury instructions nor the special verdict form contains any reference to negligence per se based on *a potential violation of section 21718*. The Dooley defendants, in contrast, contend that a negligence per se instruction *was* given. However, the record reference for this instruction indicates that it applied only to *a potential violation of Vehicle Code*

---

[11]     " 'The rule is well settled that the theory upon which a case is tried must be adhered to on appeal. A party is not permitted to change his position and adopt a new and different theory on appeal. To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant.' " (*Richmond v. Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 874.)

*section 22106*, yet the Dooley defendants do not cite Vehicle Code section 22106 or argue on appeal that Gonzalez violated this statute.[12]

Despite the position they took in their letter brief, at oral argument counsel for the Dooley defendants acknowledged that the record did not support the argument that the case was tried on a negligence per se theory based on a purported violation of section 21718. Counsel then withdrew the negligence per se argument in its entirety.

        b.     *Reasonable Care in Reentering the Freeway*

The Dooley defendants argue that, as a matter of law, Gonzalez failed to use reasonable care by obstructing the northbound lanes as he left the shoulder and attempted to reenter the freeway. More specifically, the Dooley defendants complain that Gonzalez breached the standard of care both in pulling over in such a manner as to block the traffic in the slow lane and in reentering the slow lane while Dooley was "visibly approaching" from the south.

With regard to Gonzalez pulling over on the shoulder, the Dooley defendants refer us to experts' testimony that, because the Gonzalez truck had tandem drive axles, Gonzalez was not required to install chains. However, one of the same experts presented a video that showed the jury a sign that said without limitation, " 'Chain Installation Right

---

12    In their letter brief, the Dooley defendants note that "there appears to be an error in the reporter's transcription," suggesting — without further explanation — that there may be a missing CACI No. 418 negligence per se instruction with regard to section 21718. As appellants, the Dooley defendants have the burden of providing an adequate record, and any inadequacy in the record requires that the applicable issue be resolved against them. (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295-1296.)

15

Shoulder Only' "; and Gonzalez testified unequivocally that he was required to install snow chains:

"Q:   You pulled over on the side of the road behind Craig Bond and Mr. Arlen, because you thought you had to put on snow chains?

"A:   That's correct."

"Q:   Did you have to put on snow chains?

"A:   Yes.

"Q:   Your vehicle was the type that required snow chains; is that your testimony?

"A:   That's correct.

"Q:   At that point in the road?

"A:   That's correct."

Consistently, Gonzalez's expert had no criticism of Gonzalez for pulling onto the shoulder of the road when he did.

The Dooley defendants next refer us to expert testimony to the effect that a driver who pulls out into oncoming traffic violates the standard of care. However, for any such opinions to apply to Gonzalez, the jury would have had to have found that Gonzalez saw (or could have seen) Dooley at the time Gonzalez reentered the freeway. Gonzalez testified that he did not begin to pull out until *after* he had checked over his shoulder and in his mirror and made sure there was no oncoming traffic. The jury also heard testimony from an eyewitnesses truck driver with 30 years' experience that Gonzalez "was pulling out the right way" and "doing the right job." Finally, Gonzalez's expert answered "No" to

16

the question "Do you have any criticisms of Mr. Gonzalez for pulling out on to the highway from the shoulder, when he did?"

To their credit, the Dooley defendants do identify some of this evidence we discuss. Their attempts to discredit it by directing us to cross-examination or the weight of contradictory testimony, however, are not helpful to our substantial evidence analysis. After all, the jurors were properly instructed that they "may believe all, part, or none of a witness's testimony" and that they "may believe all, part, or none of an expert's testimony." Moreover, as we explained in setting forth the standard of review at part III.A.1., *ante*, we consider and determine only the substantiality of the evidence that supports the jury's finding that Gonzalez was not negligent; we do not consider the evidence in support of the Dooley defendants' claim that Gonzalez was negligent. Given these standards and the foregoing analysis, the Dooley defendants did not meet their burden of " 'identify[ing] and establish[ing] deficiencies in the evidence' " in support of the jury's verdict. (*Holguin*, *supra*, 229 Cal.App.4th at p. 1326.)

B.      *The Dooley Defendants Did Not Meet Their Burden in Establishing That the Admission of Dwayne Johnson's Testimony Was Reversible Error*

Dwayne Johnson, the president of Htrans (Dooley's employer), was deposed as the person most qualified to testify on driver hiring and training practices at Htrans.[13] At trial, the Gonzalez defendants offered excerpts from Johnson's videotaped deposition.

_____

[13]      At trial, counsel for Htrans told the court that Johnson was the president of Htrans. In their opening brief on appeal, the Dooley defendants inconsistently tell us both that Johnson was the vice president and that he was the president. The difference in Johnson's title is irrelevant to our consideration of the issue and argument raised.

17

Over the timely objection by the Dooley defendants, the court admitted into evidence the following exchange from Johnson's deposition:

"Q:    . . . Do you think [Dooley] had some fault in the accident that occurred on March 4, 2009?"

"A.    . . . He was, in my opinion, he was a contributor to the incident.

"Q.    All right. And you know I'm going to ask you to elaborate on what 'contributor' means in your opinion."

"A.    I suppose the long and short of this is that I feel if [Dooley] had been going at a slower speed — and it was very reasonable for him to have been going at a slower speed — the severity of this incident would have been much less.

"Q.    As in it may have been avoided?

"A.    Possibly."

At trial, the Dooley defendants objected on the grounds that this testimony contained an improper lay opinion and was offered without a sufficient foundation. On appeal, the Dooley defendants argue only that the testimony contained improper lay opinion. In this regard, Evidence Code section 800 limits lay opinion testimony to "such an opinion as is permitted by law, including but not limited to an opinion that is: [¶] (a) Rationally based on the perception of the witness; and [¶] (b) Helpful to a clear understanding of his testimony." (*Ibid*.) Even before the Evidence Code, "there [wa]s no general rule of evidence which permit[ted] a witness to substitute opinions for facts." (*Nolan v. Nolan* (1909) 155 Cal. 476, 480 (*Nolan*).)

Johnson's testimony here, according to the Dooley defendants, is not admissible lay opinion testimony, but rather inadmissible opinion testimony as to the ultimate issue for the jury — namely, whether Dooley was negligent.

18

1.    *Standard of Review*

"Admission of lay opinion testimony is within the discretion of the trial court and will not be disturbed 'unless a clear abuse of discretion appears.' " (*People v. Mixon* (1982) 129 Cal.App.3d 118, 127; see *Nolan*, *supra*, 155 Cal. at pp. 480-481.)

However, without a showing of prejudice (Code Civ. Proc., § 475) that resulted in a " ' " 'miscarriage of justice' " ' " (Cal. Const., art. VI, § 13; Evid. Code, § 353, subd. (b)), even the erroneous admission of lay opinion evidence does not require a reversal. (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069 (*Pool*).) For purposes of this analysis, a "miscarriage of justice" may be found on appeal " ' "only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*Ibid*; *San Diego Gas & Electric Co. v. Schmidt* (2014) 228 Cal.App.4th 1280, 1301-1302.) Prejudice is not presumed, and the appellant bears the burden of establishing that the erroneous admission of evidence was prejudicial. (*People ex rel. City of Santa Monica v. Gabriel* (2010) 186 Cal.App.4th 882, 887 (*Gabriel*).)

2.    *Analysis*

We will assume without deciding that the Dooley defendants met their burden of establishing an abuse of discretion in admitting Johnson's testimony.

The Dooley defendants, however, present no suggestion as to how they were prejudiced by the admission of Johnson's lay opinion testimony. The entirety of their prejudice argument is as follows:

19

". . . Mr. Johnson provided substantive responses [to the questions at his deposition, which were admitted at trial,] *resulting in substantial prejudice to Dooley Defendants*. Indeed, *the prejudice experienced by Dooley Defendants* was only enhanced by the lack of foundation for Mr. Johnson's improper opinions. . . . Therefore, Dooley Defendants respectfully request this matter be remanded for a new trial of Dooley Defendants' indemnity and contribution claims against [the Gonzalez] Defendants."[14]

(Italics added.) Like the appellant in *Gabriel*, the Dooley defendants do not explain "how [they] would have obtained a more favorable result had [Johnson's] testimony . . . not been admitted." (*Gabriel*, *supra*, 186 Cal.App.4th at p. 887.) Thus, as in *Gabriel*, absent an explanation of the purported effect on the jury of the admission of Johnson's testimony, we deem the Dooley defendants to have forfeited this argument.[15] (*Ibid.*)

_____

[14] In their brief, the Gonzalez defendants argue that the admission of Johnson's testimony did not result in prejudice, given the number of witnesses called by all parties, the Dooley defendants' opportunity to cross-examine Johnson at his deposition, and the Dooley defendants' ability to rebut Johnson's testimony since the Dooley defendants knew prior to trial exactly what Johnson's testimony was. In their reply, the Dooley defendants argue that the Gonzalez defendants "have ineffectively argued that [the Dooley defendants] failed to show prejudice." (Initial capitalization omitted.) The Dooley defendants fail to appreciate that *they* had the burden to establish prejudice; the Gonzalez defendants were not required to show lack of prejudice. (*Gabriel*, *supra*, 186 Cal.App.4th at p. 887.)

The Dooley defendants' showing of prejudice in their reply — "the lack of other evidence against Dooley points to the fact that the jury must have weighed this improper testimony heavily" — is not only speculative, it is also procedurally inappropriate and substantively unconvincing. Procedurally, on issues where the appellant has the burden, we disregard arguments raised for the first time in a reply brief. (*SCI California*, *supra*, 203 Cal.App.4th at p. 573, fn. 18.) Substantively, the record is replete with evidence that Dooley was driving at an unsafe speed — testimony from an eyewitness and from Gonzalez, as well as an affirmative response attributed to Dooley himself immediately following the collision.

[15] At oral argument, when asked about prejudice (and the lack of showing of prejudice in the opening brief), counsel for the Dooley defendants emphasized that Johnson, as Htrans's president, acknowledged his employee Dooley's responsibility for

20

In any event, even if we assume that the admission of Johnson's testimony was per se prejudicial without more (which it is not), at most it prejudiced the outcome between *plaintiffs and the Dooley defendants*, not between the Dooley defendants and the Gonzalez defendants. By the admission of Johnson's testimony, the jury heard Dooley's employer say that Dooley was "a contributor to the incident" and "if he had been going at a slower speed . . . the severity of this incident would have been much less" and may have been avoided altogether. This testimony had nothing to do with whether *Gonzalez* may have been negligent; yet the Dooley defendants seek a new trial only on the "Dooley Defendants' indemnity and contribution claims against [the Gonzalez] Defendants," not on plaintiffs' claims against the Dooley defendants.

Accordingly, the Dooley defendants did not meet their burden of establishing reversible error in the admission of Johnson's lay opinion testimony.

the collision, and that this was presented to the jury within 10 minutes of the jury being instructed. This argument is too little too late.

Procedurally, we disregard arguments or theories raised for the first time at oral argument. (*Collins v. Navistar, Inc.* (2013) 214 Cal.App.4th 1486, 1508.)

In any event, substantively, counsel's belated argument does not explain how a more favorable result would have been reached had Johnson's testimony been excluded. (*Gabriel*, *supra*, 186 Cal.App.4th at p. 887.) Johnson did *not* accept full responsibility for the collision; Johnson stated only that Dooley "was a contributor to the incident." Moreover, the Dooley defendants have not cited any authority, and we have not found any, that suggests that the order of the witnesses will support a claim of prejudice — especially where, as here, the Dooley defendants did not object on this basis at trial. Finally, with regard to the timing of Johnson's testimony, even though the jury may have been instructed shortly after Johnson's testimony, *21 hours over two days* lapsed between the end of Johnson's five minutes of testimony and the jury's deliberations; in between, the jury heard evidence from two more witnesses, the jury was instructed on the law, the jury heard partial closing argument, the jury went home overnight, the jury heard the remainder of closing argument, and the jury received final instructions.

21

C.  *The Dooley Defendants Did Not Meet Their Burden in Establishing That the Admission of Derald Herling's Testimony Was Reversible Error*

Derald Herling, Ph.D., was plaintiffs' accident reconstruction expert.

On direct examination, Herling testified that, at the time Dooley struck the rear trailer of Bond's truck — which was after he had already clipped the trailer on the Gonzalez truck and hit and slid up the guardrail — Dooley was traveling at a speed of 15 miles per hour. Herling did not know, however, how fast Dooley had been driving before he hit the Gonzalez truck. According to Herling, "[t]here is no data to use in any kind of physics calculation" to have determined the rate of Dooley's speed at that time.

In answer to the question, "What did Mr. Dooley do wrong that caused this accident?" Herling later testified without objection that, "as Mr. Dooley comes across lane one towards the shoulder, *his speed was too high*." (Italics added.) When asked how he knew that Dooley's speed was too high, Herling explained, "When you are at a speed that you contact the front of your vehicle with the rear of another vehicle, you have not reduced your speed sufficiently . . . ."[16] Herling then confirmed, again in response to the question "What did Dooley do wrong that caused this accident?": "*Mr. Dooley's speed was too high*."[17] (Italics added.) In response to the follow-up question for an

---

[16]    The court overruled an objection by counsel for the Dooley defendants that Herling's explanation lacked foundation; the Dooley defendants do not mention this objection or the court's ruling in their appellate briefs.

[17]    The court overruled an objection by counsel for the Dooley defendants that this question had been asked and answered; the Dooley defendants do not mention this objection or the court's ruling in their appellate briefs.

22

opinion as to *how fast* Dooley had been driving at the time he first saw the Gonzalez truck, Herling again stated that he did not have an answer to that question.

After Herling confirmed his opinion that Dooley was traveling at 15 miles per hour at the time he struck the rear trailer of the Bond truck, plaintiffs' counsel attempted to elicit responses from Herling as to *how fast* Dooley had been driving both at the time he struck the trailer on the Gonzalez truck and at the time he struck the guardrail. Counsel for the Dooley defendants objected on the ground the questions asked for opinions that were not offered by Herling at his deposition. The court indicated it would listen to counsel and review what they had to offer from Herling's deposition at the end of the day — which the court heard at the end of the next day, in a slightly different context.

Following questions and sustained objections regarding further opinions as to Dooley's potential fault, Herling stated that he no opinions as to Dooley's responsibility for the collision "*other than speed*." (Italics added.)

During the next day's questioning, on cross-examination, Herling confirmed the accuracy of his deposition testimony that he had "no opinion as to whether Mr. Dooley was *traveling too fast for conditions*." (Italics added.) Yet, on redirect, in answer to plaintiffs' counsel's question as to how Dooley "caused this collision," Herling responded in relevant part, "his speed, *excessive for the conditions and the environment*." (Italics added.) (This last statement is the opinion at issue on appeal.) On recross-examination, Herling confirmed that, at his deposition, he stated that he had no opinion "whether Mr. Dooley was traveling too fast for the conditions," shortly after which the following exchange took place between counsel for the Dooley defendants and Herling:

23

"Q: . . . You have no opinion about whether Gabe Dooley was *going too fast*; right?

"A: I have an opinion now *about his speed*, because —

"Q: Oh, so this is an opinion you developed after your deposition, right? Is it after you deposition that you developed that opinion, sir?

"A: I would have to say from — from what I said in the deposition, yes, that would be — initially I — yes.

"[Counsel]: Okay. There will be a *Kennemur* motion,[18] Your Honor. We will go on though."

(Italics added.) In further redirect examination, as plaintiffs' counsel attempted to establish that Herling's testimony (that Dooley's speed was "excessive for the conditions and the environment") was a new rebuttal opinion based on information he learned after his deposition, counsel established that: at his deposition, Herling stated that the opinions he offered were based on the information he knew at that time, and new information may be discovered that would result in different opinions; many months after Herling's deposition, two defense experts were deposed; and Herling's new testimony was in response to the defense experts' deposition testimony. Finally, in further recross-examination, Herling confirmed that, at the time of his deposition: he did not have any additional opinions (which would have included whether Dooley was "going too fast for

_____

18 In *Kennemur v. State of California* (1982) 133 Cal.App.3d 907, the trial court did not abuse its discretion in disallowing plaintiff's expert to offer an opinion that was not disclosed at his deposition or by plaintiff's counsel at a later date based on the expert having conducted further investigation and reaching additional opinions in a new area of inquiry. (*Id.* at p. 920.)

conditions"); yet he had all the information necessary to have formed the opinion whether Dooley was "going too fast for conditions," but did not form such opinion.

At the end of that day's evidence after the jury had left, the Dooley defendants moved to strike Herling's opinion that "Dooley was traveling too fast for the conditions."[19] They based their motion on Herling's prior testimony that he had no such opinion (1) in specifically identified portions of Herling's deposition transcript, and (2) in his trial testimony the prior afternoon. The court denied the motion. On the last day of evidence, the Dooley defendants filed a written motion to strike the same testimony on the same grounds as in their oral motion. The Dooley defendants do not tell us the court's ruling, if any, on the written motion, and we have been unable to locate it in our independent review of the record.

On appeal, the Dooley defendants argue that the trial court erred in admitting Herling's opinion that Dooley was traveling too fast for conditions on two grounds: it lacked foundation; and it was an opinion that was not, and should have been, disclosed.

1. *Standard of Review*

"We review the court's admission of expert testimony for clear abuse of discretion, looking to whether the court's ruling 'exceeded the bounds of reason.' " (*Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 972.)

---

[19] The motion did not mention the prior day's objections to the questions that called for Herling's opinions as to *how fast* Dooley had been driving at the time he hit the guardrail and at the time he hit the trailer on the Gonzalez truck.

25

However, as we explained at part III.B.1. *ante*, to obtain a reversal, an appellant must establish not only error, but also prejudice resulting in a miscarriage of justice — namely, " ' "that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*Pool*, *supra*, 42 Cal.3d at p. 1069; Cal. Const., art. VI, § 13; Evid. Code, § 353, subd. (b); Code Civ. Proc., § 475; *Gabriel*, *supra*, 186 Cal.App.4th at p. 887.)

2.	*Analysis*

Initially, we agree with the Gonzalez defendants that the Dooley defendants forfeited any right they may have had to assert that Herling's opinion lacked foundation. In their response to the opening brief on appeal, the Gonzalez defendants argued that the Dooley defendants failed to object in the trial court that Herling's opinion lacked foundation. In their reply, the Dooley defendants refer us to objections trial counsel interposed to two *earlier* questions regarding whether Herling was able to calculate *the exact speed* (1) at the time Dooley hit the Bond truck, and (2) at the time Dooley hit the guardrail.[20] Here, however, the Dooley defendants' challenge is to a *later* question that resulted in an opinion that Dooley was traveling too fast for the conditions. By not timely and specifically objecting to the questions they challenge on appeal, the Dooley defendants have forfeited appellate review of the testimony on lack of foundation

---

[20]	After the court overruled the objections, Herling responded to the first question that Dooley was traveling at 15 miles per hour, and Herling never responded to the second question.

26

grounds. (Evid. Code, § 353, subd. (a); *SCI California*, *supra*, 203 Cal.App.4th at pp. 563-564.)

With regard to plaintiff's failure to have disclosed Herling's opinion that Dooley was traveling too fast for the conditions, we will again assume without deciding that the Dooley defendants met their burden of establishing an abuse of discretion in admitting the challenged testimony and again focus on prejudice.

Here, the Dooley defendants describe the prejudice they suffered as a result of the admission of Herling's undisclosed opinion as follows: "[T]he prejudicial nature of Dr. Herling's unfounded and improperly undisclosed opinion . . . is . . . that he had no other basis upon which to be critical of Dooley." We disagree. Not once, but twice, Herling was asked what Dooley did wrong that caused the collision, and both times he answered without qualification (or objection based on an undisclosed opinion): "[*Dooley's*] *speed was too high*." (Italics added.)

In addition, the arguably objectionable statement that Dooley's speed was "excessive for the conditions" is hardly different than the prior two unobjectionable statements that his "speed was too high." This is especially true given that every eyewitness testified at length as to the weather and road *conditions* on the morning of the incident, thereby putting in context Herling's testimony that Dooley's "speed was too high."

Further, the Dooley defendants' presentation of the issue suggests that the objectionable portion of Herling's testimony was the principal purpose plaintiffs called Herling as a witness. We disagree, noting that the one objectionable statement is

27

contained in testimony that covers approximately 250 pages of trial transcript. Moreover, as plaintiffs' expert, Herling also offered the opinions that neither Bond nor Arlen did anything to have caused the collision and Gonzalez caused the collision by pulling out in front of Dooley.

Finally, just like the arguably objectionable testimony from Johnson, this arguably objectionable testimony from Herling prejudiced at most the outcome between *plaintiffs and the Dooley defendants*, not between the Dooley defendants and the Gonzalez defendants. (See pt. III.B.2., *ante*.) Herling's testimony has nothing to do with whether Gonzalez may have been negligent; indeed, as we mentioned, Herling expressly testified that Gonzalez *was* negligent.

For these reasons, the Dooley defendants did not meet their burden of establishing reversible error in the admission of Herling's expert opinion testimony.

### DISPOSITION

The judgment is affirmed.


IRION, J.

WE CONCUR:


McINTYRE, Acting P. J.


AARON, J.

28